Argued and submitted January 3, affirmed May 14, petition for review denied
July 23, 2008 (345 Or 158)

In the Matter of M. M.,
a Minor Child.

STATE ex rel JUVENILE DEPARTMENT
OF MULTNOMAH COUNTY,
*Respondent,*

*v.*

J. L. M.,
*Appellant.*

Multnomah County Circuit Court
9302806193

Petition Number 103249

A136466

184 P3d 1203

94

James J. Spindor argued the cause and filed the brief for appellant.

Justice J. Rillera, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Peter Miller filed the brief for child.

Before Landau, Presiding Judge, and Schuman and Ortega, Judges.

ORTEGA, J.

## ORTEGA, J.

■         Father appeals a judgment terminating his parental rights to his now eight-year-old son. Mother's parental rights were terminated before the trial, and, accordingly, mother is not a party to this case. We review *de novo,* giving considerable weight to the juvenile court's assessment of the credibility of father and the various witnesses. ORS 419A.200(6); *State ex rel Juv. Dept. v. Geist,* 310 Or 176, 194, 796 P2d 1193 (1990). As discussed in greater detail below, father had minimal contact with child over the years since child's removal at age two and did not engage in services for the first two years after removal, until father's illegal drug use and other criminal behavior resulted in his incarceration for the better part of three years. Although he did engage in some services while in prison, father's absence from a significant portion of child's life and—in light of his history of drug use, criminal behavior, problems managing his anger, and general instability—his failure to engage meaningfully in services during most of the time that child has been out of his care, particularly on his release from prison, constitutes conduct that renders him unfit and causes serious detriment to child. For those reasons, and because father's conduct and testimony demonstrate that he cannot provide minimally adequate care to child, who has significant special needs, we affirm.

The events pertinent to our analysis occurred over many years. We begin with a brief overview. Father has a history of drug abuse dating back to his teenage years. His relationship with mother, which began in 1993, was marked by domestic violence and by at least some neglect of child's older siblings. Child was born in 2000, and he and his siblings were removed from the parents' home in 2002, at a time when father was using methamphetamine and the family home was unsanitary and unsafe. Mother engaged in services, and child was returned to her from 2003 until 2005, when child was hospitalized for serious behavioral problems. For two years after child's removal, father failed to engage in services or to complete drug treatment and had minimal contact with child. Ultimately, he committed a series of crimes that resulted in his incarceration between 2004 and 2006. He

did not have any direct contact with child for more than four years before trial.

While in prison, father successfully completed a drug treatment program. After his release from prison, however, he failed to engage in recommended aftercare, failed to participate in a parenting class, and lied to his parole officer about whether he was doing aftercare and urinalysis tests (UAs). He was only intermittently employed and failed to maintain contact with service providers. Trial occurred six months after father's release from prison and five years after child was first taken into custody by the Department of Human Services (DHS). The juvenile court found that father was unfit and terminated his parental rights.

We turn to a more detailed examination of the facts. Because father characterizes his drug use and criminal conduct as a brief interlude in an otherwise law-abiding life and relies on that characterization in support of his contention that he has addressed his only impediment to safe parenting, we begin with his life before child's birth. We then consider events after child's birth and father's conduct during the many years that child has been out of his care, before and after father's incarceration, and finally discuss child's condition and needs.

Father was born in 1968. He started drinking in his early teens and started using cocaine frequently around age 15. His drug use during his teenage years also included marijuana, LSD, and hallucinogenic mushrooms. He began having legal troubles in his late teens and early 20s. At ages 18 and 20, he drove while intoxicated, resulting eventually in convictions for driving while under the influence of intoxicants (DUII). The year after the second such incident, he was convicted of two counts of negotiating a bad check. According to father, around that time he did residential treatment because there were warrants for his arrest and police "couldn't come and arrest me at the treatment center because of confidentiality. So I checked into the treatment center, and [my father] took care of some of my legal situations." Father testified that he learned from the program and that, for four months after it, he saw a psychologist, who concluded that "there was nothing that he could do for me, that I was fine."

Father committed another DUII at age 22, resulting in a conviction in 1991. He participated in another drug and alcohol treatment program in order to regain his driving privileges. Father testified that he also was "irresponsible on making court dates" when he was in his late teens and early 20s but became more responsible such that "there's very few failure to appears in the last 10, 15 years."

Father and mother met in the summer of 1993 and soon started living together. At that time father was, by his own description, "a partially functioning drug addict and alcoholic" who "worked and functioned and made a good salary and owned [a] home." Mother was not using drugs at all.

At times, child's older siblings—mother's son, Z, born in 1992, and mother's and father's daughter, N, born in 1994—did not receive proper care. In 1995, when police investigated an injury to Z that occurred while he was with a babysitter, they found that the family home was extremely dirty and was characterized by safety hazards for the two young children. Police called the child abuse hotline but did not remove Z and N because mother's parents offered to take care of them. Two years later, father's mother, Black, reported to police that she had observed patches of missing hair on N's head and that N's shoulder had been dislocated. Father testified in the current proceeding that he could not remember whether he had then admitted to dislocating N's shoulder but minimized the significance of any injury, remembering vaguely that N's shoulder is "almost like a double jointed elbow that snaps out of place, and it just went right back into place."

Sometime in the late 1990s, not long before child's birth, father began frequent use of methamphetamine. He admits that he used about $50 worth of methamphetamine daily by 2000 and 2001. He attributes his methamphetamine use, in part, to his dysfunctional relationship with mother and to her unwillingness to do any housework, indicating that, because mother "had a really bad depression, laziness problem, * * * somewhere along the way I made a wrong decision, but I tried to get her motivated by getting her to use some drugs, too." After equipment worth $80,000 was stolen

from his business in 2001, father "gave up"; his drug problem worsened, and he started a downward spiral.

Child was born, prematurely, in March 2000, with a diagnosis of fetal alcohol syndrome and suspected prenatal drug exposure.

Eight months later, father obtained a restraining order against mother. At trial, he testified that he and mother verbally abused each other, but that there were only three incidents of physical violence between them, with mother being the aggressor in two of those incidents. He thought that the children might be sensitized to confrontations between adults as a result of the arguments. After father obtained a restraining order, mother moved out for about a month.

DHS apparently received quite a few reports about the family. In May 2001, when child was 14 months old, police performed a welfare check and found that the family home was dirty and full of fruit flies. The children, however, appeared healthy. A detective told father that he would refer the case to DHS and gave father a chance to clean up the home. In early 2002, DHS sent letters to father asking him to contact the agency about N. One letter noted that DHS had received 11 reports of concern regarding the children's welfare, including reports of physical abuse.

In April 2002, when child was two years old, child and his siblings were removed from the home, which was in a deplorable, unsafe condition. Garbage was piled high, and flies were everywhere. The rugs were black with dirt and mold, and the kitchen sink was buried in a three-foot stack of moldy dishes. One police officer described the house as perhaps the "most disgusting house I've been in, in my career." Dangers to the children included broken glass in the front and back yards, an environment filled with feces and mold, and household chemicals and kerosene in places that were easy to reach. Police believed that the volume of filth must have developed over a considerable period of time.

At trial, father acknowledged that the home's condition affected child and that "a kid shouldn't have to live like that." He admitted, too, that he could not function properly

while using drugs and that, as a result, the children were exposed to physical and emotional dangers. Nevertheless, he attributed the home's condition to mother's unwillingness to make any effort.

After the children were removed, a caseworker discussed with father the applicable legal time lines and his need to make sufficient progress within a year in order to regain custody of the children.[1] N was placed in a treatment program because of her behavioral problems. Child and Z were placed together in temporary shelter care while DHS attempted to locate a placement that would keep the boys together.

In May, two weeks after the children were removed, child was evaluated at Morrison Child and Family Services. Noting that child, then two years old, reportedly had often been left with his parents' friends and neighbors and now was in foster care, the evaluator observed that child appeared

---

[1] ORS 419B.470(2) requires that, except where reasonable efforts to return a child to a parent are excused pursuant to ORS 419B.340(5), "when a child or ward is in substitute care, the court shall conduct a permanency hearing no later than 12 months after the ward was found within the jurisdiction of the court under ORS 419B.100 or 14 months after the child or ward was placed in substitute care, whichever is the earlier." Following the permanency hearing, the court's order must include:

"The court's determination of the permanency plan for the ward that includes whether and, if applicable, when:

"(A) The ward will be returned to the parent;

"(B) The ward will be placed for adoption, and a petition for termination of parental rights will be filed;

"(C) The ward will be referred for establishment of legal guardianship; or

"(D) The ward will be placed in another planned permanent living arrangement[.]"

ORS 419B.476(5)(b). In addition, ORS 419B.498(1)(a) requires DHS, subject to certain exceptions, to file a petition for termination of parental rights if a child is in DHS's custody and has been in substitute care for 15 of the most recent 22 months.

Here, child entered substitute care in April 2002, and the juvenile court took jurisdiction in June 2002. Thus, ORS 419B.470(2) required a permanency hearing no later than June 2003. After that permanency hearing, the juvenile court found that mother was successfully engaged in services and approved a plan to gradually return child to mother. As we discuss, father had no contact with child for more than four years before trial, did not provide any support, and, for the most part, did not participate in treatment or cooperate with other services. For reasons unrelated to father's conduct, however, mother resumed custody of child in August 2003 and retained custody for two years.

to be easygoing but was struggling to adjust to shifting relationships with his caregivers. Child was overly trusting with strangers and had difficulty with communication and with appropriately expressing emotion. The evaluator opined that child needed a home with clear structure where he could form stable attachments.

That same month, Volunteers of America (VoA) began offering outreach services to father, including transportation for UAs. Father participated in a few UAs but missed others. Although his outreach worker, Morris, tried various means of contacting father, he found father very difficult to reach.

In June, San Augustine became child's DHS caseworker. DHS, too, had problems maintaining contact with father. According to San Augustine, from 2002 through 2004, father's telephone numbers "repeatedly would change * * *[;] his whereabouts consistently changed. * * * And it becomes a wild goose chase with him because he's not offering up any consistent information as to where he's at."

Meanwhile, DHS could not find a placement that would take both child and Z. Child was moved from shelter care to a foster family, but the family found him difficult to manage, in part due to his constant crying at night. Child was returned to mother in June, two months after the original removal, but, because she was still struggling and unable to care for child, he was removed again after three days and placed with a second foster family. That family reported that he had significant problems sleeping.

In mid-June, the juvenile court took jurisdiction and ordered father to complete a drug and alcohol evaluation by July 1 and to complete any recommended treatment; to enroll in parenting classes by July 15; to obtain stable housing; and to undergo a psychological evaluation as soon as possible. The week after the juvenile court took jurisdiction, father was admitted to a treatment program. However, father rarely attended, did not submit to all UAs when requested, and had a positive UA during treatment. In September, father indicated that he would not do UAs for DHS but would do them for his treatment program. The following month, however, he was discharged from that program while absent without leave.

During that three-month period between June and September, San Augustine talked with father repeatedly about how important it was for him to cooperate with treatment in order to enable reunification with child. Father, however, was focused on saving his home from foreclosure. Father wanted DHS to pay for a dumpster, paint, and a storage unit to help him with his financial difficulties related to the home but, after consulting with his supervisor, San Augustine confirmed that DHS funds were not available for that purpose. At trial father repeatedly cited those disputes as precipitating the deterioration of his relationship with DHS. Although he claimed that, "if I knew * * * then what I know now, I would have done everything that was required of me then, and put all my differences aside with [San Augustine]," he nevertheless continued to blame DHS for breaking promises to him, asserting that "they reneged on the dumpster, they reneged on the paint, and that's when I started having a problem."

Father became angry and aggressive toward San Augustine. In September, security at DHS twice intervened because father was so agitated. After a hearing, he became angry and threw papers because DHS took the position that, if parents were not engaged in services by December, the agency would pursue termination of their rights.

At that time, the court ordered father to engage in residential treatment (rather than the outpatient treatment that he said he planned to do) and parenting classes. In the meantime, child was placed with mother's parents in southern Oregon, his fifth placement in the five months since removal from father's care. However, that placement also did not go well. The grandparents reported that child had behavior problems and was aggressive, hitting and biting. Over the next two months, father did not appear for visits or contact DHS, so in December the agency suspended visits. It appears from the record that father, who had visited with child in 2002, had no further visits with child after the agency suspended visits.[2]

---

[2] San Augustine testified that the agency suspended visits in December 2002 after father missed visits in October and November. Father testified that his last visit with child was in February 2003 or possibly as early as December 2002.

Father's lack of compliance with services continued. Although father was referred to a VoA parenting class and attended orientation that December, he did not attend any classes. That same month, father contacted San Augustine and said that he wanted drug treatment, so San Augustine arranged for an outpatient program that led into a six-month inpatient program. The juvenile court noted that DHS was providing "comprehensive, excellent services—exemplary casework," and ordered father to follow the program's directions. Father, however, did not want to engage in inpatient treatment then because he was trying to arrange for storage before the imminent foreclosure on his house, scheduled for two months hence in February 2003.[3] Father checked into the outpatient program in early December, and an intake UA was positive for amphetamines. He missed most of his UAs and did not follow the program; when he was discharged in January, he was given a poor prognosis unless he engaged in residential treatment. Father never went to the inpatient program.

That January, child's placement with mother's parents was disrupted because they could not handle his aggressive behavior and used inappropriate physical discipline on him. DHS put child in an emergency placement, his sixth placement in nine months.

Meanwhile, mother became engaged in services in January 2003. Because mother was improving, DHS did not pursue termination of either parent's rights. In August 2003, child was abruptly returned to mother, his seventh move in the 16 months since his original removal. Sometime after that, child was diagnosed with bipolar disorder.

Throughout 2003, father's contact with DHS and service providers was intermittent and unreliable. He failed to follow through on treatment programs, and he committed a number of crimes. Because he was so rarely in contact with DHS, the agency could not advise or consult with him about

---

[3] Father testified that, after child was removed, he had tried to prevent foreclosure but, by winter, realized that he would lose the house. He could have taken out a loan, "[b]ut I had refinanced already a few times, and I'd already went through six bankruptcies."

child's needs. To DHS's knowledge, he failed to send anything to child or to make any inquiries about child that entire year.[4]

Father was convicted of a number of crimes—including theft, forgery, identity theft, and possession of a controlled substance—committed in 2003 and 2004. Father testified that he was in jail from December 2003 to January 2004, out for a week, and then in again until May or June 2004. That May, he wrote to San Augustine and stated that he was in jail, had been sober for three months, and was participating in services. After being out for a month and a half (during which time he failed to show up for two appointments with San Augustine), he was again incarcerated from July 2004 to December 2006. While in prison, father committed three rule violations, including an assault on another inmate.

At trial, father testified that he had been clean and sober since February 2004 (some five months *before* the date of the last crime of which father was convicted). Father admitted that, during that February, he had failed to comply with a supervised release program, but he testified that he then complied and provided clean UAs from May until his arrest in July. Program records indicate, however, that he failed to sign up as required in May and failed to do drug screens in July.

In August 2004, father wrote to mother and to child, asking child (then age four) to tell mother that father loved her. Around that time, mother told San Augustine that she did not want contact with father.[5] Father admitted that, around December 2004, while he was in prison, he wrote a threatening letter to mother because he "was trying to get a response out of her" and was frustrated that mother and San Augustine were not responding to his inquiries. Mother eventually obtained a restraining order against father in February 2005.

---

[4] San Augustine had informed father at some point that he would not be allowed further contact until he got into a program.

[5] Father testified that his relationship with mother ended in June or July of 2003, but that she stayed with him for five days in December 2003. In July 2004, the couple had another child.

Meanwhile, in September 2004, father wrote to San Augustine that he wanted visits with the children, who had not seen father in more than a year, while in prison. The following month, the juvenile court ordered DHS to develop a plan for visits only as approved by a therapist. However, San Augustine did not contact father, except during court appearances, until the summer of 2005.

Child remained with mother until July 2005, when his behavioral issues (which are discussed in more detail below) became too difficult for her to handle. Mother still wanted child to be returned to her, and DHS continued to work with her. Child was hospitalized from July 25 to August 9 and from there went to the Parry Center until December 2005. He then was placed in a therapeutic foster home until May 2006, when he was placed with his current foster family, his 11th and final placement.

In August 2005, while child was at Parry Center, San Augustine met with father, who was still incarcerated, and reported that child was in DHS custody again. They discussed the plan for the case and reached an agreement that father would write to child each month and that therapists would filter any letters. Father wrote to child and to San Augustine each month from August 2005 through January 2006. Child's therapists, however, recommended that child have no contact with father, a point San Augustine neglected to report to father once he learned it.[6] Until March 2006,

---

[6] Child's therapists felt that the time for reintroducing father into child's life was not right in August 2005; having had no contact with father for at least two and one-half years, child, then five years old, never spoke of father. The therapists wanted to focus on helping child adjust to his placements at the Parry Center and then in therapeutic foster care and to put energy into fostering child's ongoing relationship with mother. In December 2005, San Augustine asked child if he remembered father or wanted contact with father, and child answered no to both questions. San Augustine did give child a Christmas gift that father had sent and told child that the gift was from father.

Weber, the therapist who began working with child in June 2006, did not want to introduce contact with father because child had just moved from therapeutic foster care to his current foster family. She was concerned that child—who was saying at that time that his father was in heaven—would be very confused. Then, in November 2006, child told Weber that his sister, N, had said that father was getting out of prison and that they would all live together. Child reported having nightmares all night after the conversation with N. He told Weber that he did not want to see father and appeared very anxious and scared by the idea that he would

when San Augustine stated during a hearing that the letters were not being given to child, father believed that they were. Feeling upset and let down by DHS, father did not write to child after that.

DHS decided to pursue termination of both parents' rights in May 2006, and the termination petition was filed in July. DHS still had a concurrent plan of returning child to a parent and told father's attorney that father still needed to comply with prior expectations and that DHS was willing to offer services.

At the same time that DHS decided to pursue termination, father, still incarcerated, started participating in the Turning Point program, an intensive treatment program in which patients are segregated from the rest of the prison population. Waleed, a substance abuse counselor who worked with father, thought that he made progress in anger management. Father seemed to Waleed to be excited about reuniting with child and realistic in his views of parenting and child's needs. Father asked prison officials for a parenting class but was not enrolled in one.

In July 2006, the juvenile court entered a permanency judgment with a plan of adoption. San Augustine had had very little contact with father in 2003 and 2004, and, although he resumed contact with father in late 2005, San Augustine devoted most of his energy to assisting mother in her efforts to regain custody of child. Accordingly, in that July 2006 hearing, the court noted that father was complaining that San Augustine had not been in contact with him and ordered DHS to continue with its case plan and provide parents with progress reports regarding child. Over the next two months, San Augustine at last communicated with father's then-attorney about setting up a psychological evaluation. The evaluation did not take place as scheduled, however, because father's attorney objected to the psychologist that DHS had designated.

Before his release from prison in December 2006, father successfully completed the Turning Point program.

be forced to do so. Weber told San Augustine that she was concerned about child's anxiety level if he were forced to see father.

According to his discharge summary, he "moderately improved" as to his tendency to take the victim stance and become angry when confronted with his behavior and in addressing "thinking errors connected to his glorifying, criminal pride, justifying, unrealistic expectations, and personalizing. [He] demonstrated a wide range of skills and competency to help address the currently mentioned problem areas." Turning Point recommended "a three to six month aftercare program due to [father's] patterns of relapse."

As we explain in further detail below, however, during the six months between father's release from prison and the beginning of the trial, father failed to engage in aftercare. He provided only one UA (which was clean); was dishonest with his probation officer (PO) about doing aftercare and UAs through DHS; left subsidized drug-free housing that included a program to hold him accountable for his behavior, opting instead to live with a recovering addict with whom he had previously used methamphetamine; and participated only minimally in services provided by VoA. In addition, he failed to attend parenting classes and failed to appear for a psychological evaluation arranged by DHS. Although father did do a psychological evaluation on a referral from his attorney, he was not honest with the psychologist about his history, undermining the validity of that evaluation.

Smith, an alcohol and drug counselor with Turning Point, testified that, although father graduated from the program in prison, his recovery process was not complete. Recovery generally is not complete until someone "has constantly exhibited abstinence and lessened his aggressive behavior, become a responsible person in society," and remained clean outside of treatment for over a year.

Smith clearly recommended aftercare for three to six months. He expected father's PO to refer father to aftercare, because father might have problems paying for it. When father did intake for parole immediately on his release from prison, a drug and alcohol triage evaluator did not recommend treatment and indicated that father did not meet requirements for referral to a free outpatient program.

Father's PO testified at trial, however, that father was eligible for outpatient treatment (free or at a reduced cost) and simply needed to request it.

In any event, father acknowledged that Smith had recommended that he attend three to six months of aftercare because of his patterns of relapse. Nevertheless, at the time of trial, he had not begun an aftercare program or found a sponsor for his 12-step program. Despite that, father maintained that he had met every goal in his discharge plan: that is, as he characterized it, he exercised regularly at a gym (despite his insistence that he could not afford aftercare and parenting classes), did "fun stuff" with his family, did not use drugs, communicated better with everyone, and "surrendered to [his] PO" by meeting his PO's requirements. He attended various Alcoholics Anonymous (AA) groups at least once a week (without committing to one group), although his aftercare plan called for him to attend three self-help groups per week with a specified "home group."

Father was evasive about whether he actually needed aftercare. After being asked about it several times and finally being ordered to answer, father testified that he did not think he needed it, although he later acknowledged a need to continue work on his recovery.

In Smith's view, father's failure to do aftercare raised concerns of a risk of possible relapse and a resurgence of problems with anger management, communication, and criminal behavior. Risk factors and warning signs would include a lack of housing, employment, or support; a failure to be available for UAs; and missing appointments for drug and alcohol screening. As we describe further below, all of those risk factors and warning signs were evident at trial, six months after father's release from prison.

Aftercare also was recommended to address father's tendency to view himself as a victim and to become aggressive when confronted. Although father's work in the Turning Point program had led to moderate improvements in anger management, he continued to have issues, as evidenced by his answer late in the program that he would respond to a frustrating traffic situation by breaking the other driver's taillights.

Two months after his release, father was evaluated by a psychologist, Dr. Sacks, on a referral from his attorney. In preparation for the evaluation, Sacks reviewed over 100 pages of records, but DHS was not informed of the evaluation until later and did not provide any information to Sacks. Father gave an incomplete history of his criminal and drug involvement. He told Sacks that he had engaged in criminal behavior in 2002 and 2003 and had been sober since December 2003. He reported that, aside from a single DUII and a conviction for driving while suspended, his serious criminal and drug activity began when he lost his business in 2001. Accordingly, Sacks proceeded with an erroneous view that father had lived a law-abiding and drug-free life except for minor adolescent drug use and a couple of bad years while using methamphetamine. Sacks also understood that father was currently employed, living in alcohol- and drug-free housing, and attending aftercare meetings, none of which was true by the time of trial and for most of the six months following father's release from prison.

From those erroneous premises, Sacks diagnosed father with poly-substance dependence in full sustained remission and adult antisocial behavior in remission. Father's MMPI results were those of "a person who's happy, healthy, and contented, and has good relationships with people, and generally gets along well with people." Sacks recommended that father attend Narcotics Anonymous (NA) meetings and provide random UAs. He concluded:

> "A future relapse is the only apparent impediment to safe parenting. He does not appear to suffer an additional mental illness which might impair his parenting capability. He engaged in adult antisocial behavior in the context of heavy drug use and, as long as drugs are not a part of his life, it is likely he will avoid antisocial acts. If [father] can establish stable housing, vocation, [NA] meeting attendance, and provide clean UA's for six months, while avoiding association with those who use drugs, he can be considered to have displayed sufficient sobriety to reduce the chance of relapse, so that it is no longer a parenting issue."

Sacks's interview with father was an important part of the diagnosis. Based on the interview, Sacks thought that father was frank and not minimizing to any great degree. On

cross-examination at trial, however, Sacks acknowledged that he had not been informed of the extent of father's history of drug use, criminal conduct, police contacts, and threatening behavior.[7] He noted that information brought out on cross-examination "described a lot of concerning allegations about a pattern of behavior." The juvenile court concluded that Sacks lacked the information needed to adequately evaluate father and gave his opinion very little weight.

Two weeks after that evaluation, in mid-February, San Augustine (still unaware of the evaluation) spoke with father's attorney's legal assistant about DHS's expectations, which remained similar to those set out more than four years earlier. San Augustine told her that father could contact Tobey at VoA for aftercare assistance. The following month, father's attorney reported that father was providing regular UAs to his PO. However, father actually provided only one such UA; after that, he told his PO, erroneously, that he was starting to do UAs through DHS.

Before father left prison, Smith had set up housing for him at Medford House, subsidized housing that includes aftercare expectations. Medford House offers some supervision of sobriety, an on-site counselor, and a corrections counselor who is a liaison with the PO. Placement there typically lasts for six to nine months and is intended as a stepping stone; residents who are seeking work are charged no rent and, after they find work, the program helps them save for other housing.

---

[7] Father recounted a good childhood, without behavior indicative of oppositional-defiant or conduct disorder, and reported that he used alcohol and marijuana as a teen and alcohol and cocaine in his 20s, but that he was in stable employment and a stable relationship, avoided arrests, and did not engage in heavily antisocial behavior. Sacks was not told how early and frequently father had used illegal drugs. Father told Sacks that he had completed a DUII diversion program as a teenager but not that he entered a residential treatment program to avoid arrest warrants. Father reported that he had worked successfully for his father's business but did not disclose the major falling out after his departure. Sacks was not informed about father's police contacts in 1995 and 2001, nor about the condition of his home at those times. Father informed Sacks that, while out of custody in 2004, he was clean and sober and giving clean UAs through the Washington State supervised release program, but not that he had been cited three times for failing to comply. Sacks was unaware that father had been aggressive toward his caseworker, had been disciplined three times in prison, and had sent a threatening letter to mother.

Three months after his release, however, father left Medford House and moved in with a friend, Lewis. Father testified that he did not want to stay at Medford House because drug activity occurred there and sex offenders lived there. Father and Lewis had used methamphetamine together five years earlier; Lewis had some criminal history but had been sober since September 2006, when she had an incident of possession of a controlled substance. She thought that father appeared to be clean and sober and that they provided mutual support for recovery.

Although the residence was acceptable to father's PO, father did not consider it suitable for child to live in, and Lewis was not willing to have DHS inspect the home except by appointment. Father testified that, if child were returned to him, he would borrow some money and move.

Around the time that father moved in with Lewis, his attorney expressed concern that father was not receiving referrals. San Augustine responded that father already had a referral to Tobey for a UA plan, which would include a recommendation for outpatient services, and a referral to parenting classes, which had been provided a few months earlier. San Augustine offered to provide additional referrals for domestic violence prevention and a psychological evaluation. He requested releases to contact service providers and permission to contact father directly, which was denied.

Soon after that, Brown became father's PO. In light of Turning Point's recommendation, Brown thought that father needed continued treatment and that he was eligible for free or reduced-price services. Brown did not require father to obtain treatment, however, because father falsely reported that he was already doing aftercare through DHS. On learning at trial of father's false report, Brown referred father to treatment immediately and began requiring random UAs.

Father also falsely reported to Brown that he was taking parenting classes, but he then failed to attend an intake appointment or attend any classes. Although VoA opened another outreach case for father, he repeatedly delayed the screening despite repeated attempts to schedule with him, until the screening finally was conducted a month before trial.

As a result of that screening, Tobey recommended that father do an alcohol and drug assessment with ChangePoint (to be paid for by DHS), attend self-help groups such as AA and NA, continue outreach services with VoA, and do random UAs. Generally, after screening, Tobey has the client return to meet and discuss recommended actions. However, father called Tobey two weeks before trial to report a new phone number—which was out of order when Tobey called it—and Tobey did not hear from father again. Father called VoA a week later to say that he had lost his ID and needed to replace it before doing any UAs, but did not contact them again after that. As of the time of trial, father still had not done any UAs through VoA. At trial, father testified that he could not do the UA program because he lacked a current ID card and had "got[ten] the runaround" in his attempts to obtain a new ID.

Likewise, in the months before trial, father failed to engage in a scheduled psychological evaluation. About a month before trial, the parties agreed that DHS would try to schedule an evaluation by Dr. Basham. Although Basham's schedule was full, his office set up an emergency appointment because of the upcoming trial date. Two weeks before trial, San Augustine attempted without success to reach father by phone at two different numbers to inform him of the appointment and also called father's attorney's office. San Augustine hand-delivered a letter to father's apartment in the morning and stopped by again in the afternoon to confirm receipt of the letter. Lewis assured San Augustine that father would receive the letter. However, father failed to attend the appointment; he testified that he had worked a night shift the previous night and that he "just completely forgot that there was an appointment the next day because that letter was not with my regular mail."

Father was employed intermittently after his release from prison and expressed confidence that he could find a job as soon as the trial was over. He quit the first job he obtained after his release, purportedly because he was concerned about some coworkers who reportedly were on federal parole. After about a month of unemployment, he did some intermittent construction work and, in the month before trial, worked for a pair of gas stations. By the time of trial, however, that job had ended. Father testified that he worked

for the gas stations for just under three weeks and that the employer had followed improper employment practices, paying him with cash and a personal check. According to the employer, however, father worked only two days at each gas station. He was several hours late one day and then simply did not show up for work another day, so his employment was terminated.

As a condition of parole, father was to report employment changes in advance or, if he was fired, the next working day. However, after testifying at trial that his employment had ended, he told Brown merely that he was not working many hours.

During trial, father expressed anger and frustration. He even interrupted San Augustine's testimony to call it "bullshit" and, after the court instructed him that he would be held in contempt if he made any more such remarks, he added, "He's under oath." A little later, father interrupted San Augustine's testimony again to say that he needed to leave the room because he could not listen to San Augustine. In San Augustine's view, father's behavior was similar to his conduct in 2002, when he became agitated and hostile when he disagreed with others' statements.

After trial recessed that day, child's foster mother, Catherine, encountered father on her way to her car. Father called to her in a loud, angry voice, saying that he wanted to know how child was and wanted to see child. Catherine, concerned for her safety, ignored father and hurried to her car. Father walked toward Catherine, but, when she walked away without acknowledging him, he stopped. Father, for his part, minimized the incident. According to him, at the time he called to Catherine he was pacing back and forth and talking on the phone, because pacing and talking were coping mechanisms for him. He reported that he had not been upset with Catherine; he "might have asked how [child] was doing and stuff like that."

We turn to the evidence regarding child's condition and needs. The testimony from mental health care providers who have worked with child does not clearly identify the origins of child's problems. Nonetheless, it is clear that child has significant issues that, despite improvements, remain a concern.

As noted above, child was hospitalized from July 26 until August 10, 2005. The hospitalization occurred because of concerns about his physically aggressive behaviors and possible over-medication. When admitted, child, then five years old, was on four different medications, and over-medication caused drooling and a lack of coordination. His medication was decreased during his hospitalization. At discharge, child was prescribed one medication to reduce nightmares and help him sleep and a second to reduce explosive anger outbursts.

During child's hospitalization, a psychiatrist, Dr. Eshelman, diagnosed child with a disruptive behavior disorder not otherwise specified, which she thought might actually be an attention-deficit/hyperactivity disorder; reactive attachment disorder; phonological disorder; and communication disorder with consideration of ruling out either a mixed receptive/expressive language disorder or a development coordination disorder. Further testing was needed to determine whether child had borderline intellectual functioning or mild mental retardation.

Child's disruptive behavior manifested in anger outbursts and tantrums. Eshelman observed that any changes in predictable structure upset child, resulting in an intense reaction outside the normal range. Child excessively sought comfort from adults, "[g]oing to people and hugging them, saying I love you to people he had never even met, new staff members, anyone that would come on the unit."

Child's problems improved but did not fully resolve during his hospitalization. Eshelman recommended inpatient treatment at the Parry Center and then possibly a placement in therapeutic foster care. Child was in the Parry Center until December 2005 and then in therapeutic foster care until May 2006. After that, child was placed with his current foster family.

Shortly after that placement, Weber, a child and family therapist, started working with child, with a focus on his aggression and anxiety. She observed that child was very warm and friendly, but also very clingy and anxious, with behavior problems related to physical aggression such as hitting and shoving. Child's foster mother, Catherine, testified that child kept his suitcase packed for a few months after

moving into her home because he was afraid that he would have to move again. He was defiant and would scream, throw things, and hit people. He also had extreme anxiety and would fly into a rage over any change.

Child's working diagnoses were adjustment disorder, enuresis, physical abuse of a child, and disruptive behavior disorder not otherwise specified. The behavior disorder manifested in physical aggression with other children, screaming for long periods and resisting comfort, and defying adult direction. By October 2006, child's behavior disorder was in remission; he had improved and was not displaying as many of the troubling behaviors. His other diagnoses continued.

Child's adjustment disorder impaired his social functioning and his ability to function in a typical classroom. Child also has some issues with learning disabilities. Consequently, he was placed in a special education program and worked with therapists and learning specialists. He began moving into some mainstream classes in November 2006 and, by February 2007, was full time in mainstream classes, although he had additional supports and could go to a behavior support classroom when needed. Catherine, who had training in teaching special education, attended all meetings at child's school and worked with his teachers and counselors to support him and provide consistency between home and school. She changed her job schedule and took off 348 hours from work in one year in order to manage appointments to meet child's needs.

Child had made significant progress and had not had any major aggressive incidents in the three months before trial. He appeared healthier and happier and was making more friends. His medications had been decreased, and his foster parents were advocates for him to avoid overmedication. Child's screaming episodes and rages had decreased, and he had learned to better accept consequences for misbehavior so that his behaviors were much closer to normal, although his issues were not fully resolved. Catherine thought that child had "made great strides in controlling his anger and learning better ways of dealing with it,

but a disruption in his life, a lack of consistency would push him right back to where he was."

Weber attributed some of child's success to his stability and secure attachment with his foster parents. Although child had experienced too many transitions in his life, he was able to attach to his foster family, turning to them for reassurance and support. When things bothered child, he sometimes told his foster parents before telling Weber in therapy, which Weber saw as "a really great sign of a secure attachment with them."

Child's foster parents worked hard to meet his needs and help him form healthy attachments, and they were doing very well together. Child was successful with his foster family in part because of the family's special skills. In particular, Weber noted that Catherine is remarkably good at communicating with child, very accepting and loving, and patient and empathetic. Catherine also is very good at recognizing triggers for child's behavior; for example, once when child began acting out, she deduced that he was upset because there were boxes in the living room and he was afraid of a move. Although Weber would work with someone who wanted to acquire those skills, she could not predict the result.

Child continues to find change difficult. Even moving classrooms at school was hard for child, who was behind academically at the time of trial and faced the possibility of repeating first grade. Anxiety increases his difficulty in meeting developmental milestones; many of his behavioral and academic problems are linked to anxiety.

Weber and Eshelman both opined that child needs a secure attachment with his primary caregiver. He needs a parent to be consistent, organize his appointments, and provide predictable structure. In Eshelman's view, if a secure attachment were disrupted, child would be at risk of regressing.

Child has repeatedly told Weber that he does not want to move again and that he wants to be adopted by his foster parents, whom he calls his mother and father. Child has consistently told Weber that he has no memory of father,

whom he has not seen since he was two years old. He became very upset and frightened on an occasion in November 2006, when N told him that father was getting out of jail and that they would all be together.

Trial in this case occurred over nine days in May, June, and July 2007. The juvenile court found that father has a history of addiction and that his failure to engage in services after his release from prison "certainly casts suspicion on his claim that this long history of substance abuse has been dealt with to a level that makes him fit to parent." The court found clear and convincing evidence of unfitness on multiple fronts. Most pertinent to our analysis, the juvenile court found that father had a pattern of residential and employment instability that substantially interfered with his ability to care for child, that he had failed to adjust his circumstances despite offers of services, and that he had a pattern of ignoring court orders and resisting DHS. The court found that father did nothing after his release from prison to demonstrate that his various conditions had been ameliorated. Father had not participated in aftercare and had lied to his probation officer about it. He had "continued to manipulate the system to avoid taking" UAs, and his own statements were not credible, according to the trial court. Father also had not done parenting classes. The court noted, "If he had done the services after his release, perhaps this case would not be in the posture it is in. [Father] has no one to blame but himself."

The court observed that father listened to sad testimony about child's condition "without any affect whatsoever. It is absolutely clear that [child] requires a degree of parenting and care that * * * father is not capable of understanding, let alone * * * perfecting, even with the assistance of social service agencies." The court concluded that termination was in child's best interests.

On appeal, father argues that the trial court erred. He contends that DHS failed to make reasonable efforts to allow for reunification after he completed the Turning Point program and that DHS should have worked with him more while he was in prison and after his release. In his view, his only condition relating to parental fitness was an addiction to

methamphetamine between 2001 and 2004, and Sacks's evaluation indicates that he could eliminate any concern about relapse—and thus any concern about parenting—within six months. Before his methamphetamine addiction, father "had a history of being a responsible person and parent." He asserts that he adjusted his circumstances by completing the Turning Point program, complying with post-prison supervision, and avoiding drug users. Finally, he contends that termination was not in child's best interests because child was doing fine before his removal, so father must have been an adequate parent then; child was attached to father at that time, so he would benefit from being reunited with father.

DHS responds that father continues to be an unfit parent and that drug addiction and the risk of relapse are not the only problems; father also lacks suitable housing, employment, parenting skills, and any relationship with child. The agency also contends that father's sobriety while in prison is not enough to address his drug addiction, given his subsequent failure to engage in aftercare, to find a sponsor for his 12-step program, or to provide UAs. Father failed to engage in services even after his own psychologist gave service recommendations. Child cannot wait any longer for permanency, according to DHS, and reintegration would take a long time in light of father's own projection that he needs another six months to demonstrate sobriety and given the lack of any relationship between father and child. DHS contends that it made reasonable efforts toward reunification. Given the lack of a relationship between father and child and given child's reaction to the thought of meeting father, termination is in child's best interests.

Child contends that father's substance abuse was seriously detrimental to child and that father's dishonesty about UAs and aftercare and his failure to follow through with other services show that he is not successfully addressing his issues. Father could not meet child's needs, and, in light of child's needs and the length of time that child has been out of father's custody, it would be unreasonable to make child wait any longer for permanency.

■■ We agree with DHS and child that the trial court did not err in terminating father's parental rights. We begin with the legal framework for termination. ORS 419B.504 provides:

> "The rights of the parent * * * may be terminated as provided in ORS 419B.500 if the court finds that the parent * * * [is] unfit by reason of conduct or condition seriously detrimental to the child * * * and integration of the child * * * into the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:
>
> "* * * * *
>
> "(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child * * * to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

ORS 419B.504 requires a two-step analysis. First, the court must examine (a) whether the parent has engaged in conduct or is characterized by a condition and (b) whether the conduct or condition is seriously detrimental to the child. Second, if the parent is unfit, the court must determine whether it is improbable that the child will, within a reasonable time, be integrated into the parent's home. *State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 80-81, 106 P3d 627 (2005); *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001). A formerly unfit parent may become fit, and a parent's rights may be terminated only if the parent is presently unfit. *State ex rel Dept. of Human Services v. Rardin*, 340 Or 436, 448, 134 P3d 940 (2006).

■■ The focus is on the detrimental effect of the parent's conduct or condition, not in the abstract, but on the child. *State ex rel Dept. of Human Services v. Simmons*, 342 Or 76, 96, 149 P3d 1124 (2006); *State ex rel Juv. Dept. v. F. W.*, 218 Or App 436, 456, 180 P3d 69 (2008). In examining whether a parent is unfit, the "inquiry necessarily focuses on the severity of the adverse effect of a parent's conduct or condition on

the child. That is, the more adverse its effect on the child, the more likely it is that the parent's conduct or condition will render him or her unfit." *F. W.*, 218 Or App at 462.

Facts supporting termination must be proved by clear and convincing evidence, which is evidence that makes the asserted facts highly probable. ORS 419B.521(1); *State ex rel Dept. of Human Services v. Radiske*, 208 Or App 25, 48, 144 P3d 943 (2006). In assessing a parent's fitness, we view all proven conduct or conditions in combination. *Radiske*, 208 Or App at 49.

Here, father's conduct or condition is difficult to characterize succinctly, in part because father has avoided providing reasonable means for assessing his situation, particularly with respect to his sobriety and his psychological state. He manipulated the system to avoid UAs and lied to his PO about participating in aftercare, thus avoiding a requirement that he engage in treatment. He prevented any reliable psychological evaluation by being dishonest with Sacks and by failing to show up for the evaluation with Basham.

Like the trial court, we give little weight to Sacks's evaluation of father because Sacks had an incomplete history of father's life. We nevertheless note that Sacks thought that father needed to do far more than he has done to establish his sobriety and become a safe parent. Sacks concluded that, if father could "establish stable housing, vocation, [NA] meeting attendance, and provide clean UA's for six months, while avoiding association with those who use drugs, he can be considered to have displayed sufficient sobriety to reduce the chance of relapse, so that it is no longer a parenting issue."

Father did not accomplish those goals. In the four months between that evaluation and trial, father moved from a drug-free housing program to living with someone with whom he had formerly used methamphetamine, a situation that provided for lower accountability than his previous situation. He had worked only sporadically; had attended fewer NA meetings than recommended in his Turning Point discharge; had not found an NA sponsor or established a home group; and had provided only one UA, while lying to his PO

about providing them elsewhere. Even under an unwarrant-edly optimistic view of father's situation, therefore, father's sobriety remains a cause for serious concern. As the trial court found regarding father's maintenance of sobriety, "[t]he only evidence we have [is] his statements at trial, and he is not credible." Accordingly, we are satisfied that DHS has demonstrated a failure on father's part to address his drug addiction to make it possible for child to safely return home within a reasonable time. *See* ORS 419B.504(5). Whether or not father has actually relapsed into drug use, he is not able to safely parent child.

In any event, even apart from his drug addiction, viewing father's conduct and history in light of child's specific needs, we find a pattern of conduct demonstrating that father cannot provide the steady, patient care needed to sustain child's improved, but still fragile, mental health. Father's failure to engage meaningfully in services during most of the time that child has been out of his care, particularly on his release from prison, constitutes a failure to adjust his condi-tions, conduct, and circumstances to make it possible for child to safely return to father's care within a reasonable time. *See* ORS 419B.504(5). We address below the further specific aspects of father's conduct that are seriously detri-mental to child—his inability to manage his anger, his unsta-ble living situation, and his inadequate parenting skills, as well as his failure to engage in services to address each of those concerns.

First, father is unable or unwilling to manage his anger. Although Smith identified anger management as an issue for father to address in aftercare, father failed to engage in that recommended treatment. Father's problems in man-aging anger are evident in his past behavior—including threats, assault, and admitted verbal abuse and occasional domestic violence with mother—and in his conduct during trial, a time when he reasonably would be expected to be on his best behavior.

Given child's anxiety and anger issues and his high need for stability, father's anger management issues would prevent him from meeting child's needs and thus are seri-ously detrimental to child. Indeed, father acknowledged that,

as a result of his disputes with mother during child's earliest years, child is probably more sensitized to confrontations between adults. Child requires consistency, and father's inability to control his own anger is among the reasons why he cannot provide that consistency.

Second, father's living situation is unstable. Father has become unstable in his employment, not remaining in any position for long after his release from prison and not being honest with his PO about his employment status. He has been at least minimally unstable in his housing, leaving housing where his recovery would be somewhat supervised to move in with a friend with whom he formerly used methamphetamine and professing plans to move again if child were returned. That instability might not be worrisome in other cases, but here it is part of a larger pattern of instability and—according to Smith's testimony and Sacks's evaluation—also raises concerns about the stability of father's recovery from drug addiction.

Father's pattern of instability likewise is seriously detrimental to child.[8] Child continues to experience significant problems, despite recent improvements. Although father's current conduct might not be seriously detrimental to some children, it is seriously detrimental to this high-needs child. Child requires consistent, patient care to avoid regressing, and father's conduct demonstrates that he cannot provide such care. Father is therefore not presently fit to parent child. *See F. W.*, 218 Or App at 467 (concluding that, although the father's drug dependency was in remission at the time of trial, the combination of father's drug dependency and mental disorders and the children's special needs made the father unable to adequately appreciate and meet the children's needs).

---

[8] As noted above, the mental health care providers who have worked with child did not identify the causes of child's emotional problems. Father acknowledges neglecting child before child was removed, and father failed to make any progress toward parental fitness before beginning Turning Point—four years after child was removed. Although father's past neglect may have contributed to child's problems, we cannot tell, on this record, the exact extent to which father's behavior is responsible for child's condition, except to the extent that, while father was unavailable to care for him, child was subjected to numerous changes in placement that contributed to his problems forming secure attachments.

Finally, we address father's parenting skills—that is, his ability to be a minimally adequate parent to child. Because father has not seen child for years, a direct assessment of his parenting skills at the time of trial is difficult. Father clearly displayed inadequate parenting skills at the time child was removed, and father acknowledged that he did not provide proper care for child at that time, attributing that deficiency to his drug addiction. He presently has no relationship with child, and child expresses fear at the thought of living with father. While child has been in foster care and residential treatment, father has failed to take parenting classes, despite multiple referrals. There is no indication that father's parenting skills have improved over the years, and father's failure to take parenting classes evidences an inability or unwillingness to take steps to ensure child's well-being, as does father's failure to demonstrate any real concern for child in the face of very disturbing evidence of child's suffering in the years that he has been out of father's care. Father's lack of effort to develop skills is significant because child requires a particularly skilled parent.

Father's situation thus differs from that of the mother in *State ex rel Dept. of Human Services v. L. S.*, 211 Or App 221, 240-41, 154 P3d 148 (2007). There, the children were doing well, and the mother was a good parent when she was not using drugs. Although the mother's drug use was the only impediment to her being a safe parent, the only evidence about the mother's drug use—other than her boyfriend's and her mother's testimony about their observations that she appeared to be sober—was from about 17 months before trial. *Id.* Here, by contrast, child has significant mental health issues and no relationship at all with father, and father has done nothing to improve his parenting skills during the period that child has been out of his care.

Overall, father has been inconsistent in his participation in services designed to help him become a safe parent, participating only intermittently and incompletely. During the five years that child was in DHS's custody before trial, father was in contact with service providers only sporadically and had completed only one program (Turning Point) out of the many services that he was offered. Even accepting

father's explanations for his most recent failings, he was unable to get organized enough to attend the scheduled psychological evaluation with Basham or to obtain the necessary identification to provide UAs. He avoided aftercare that he knew was recommended. Father has not effected any adjustment in that behavior over the years. Again, father's inconsistencies are part of a larger pattern of behavior and also are, as Smith explained, warning signs that his recovery is in jeopardy.

Father's inability or unwillingness to follow through on services and to maintain stability in his own life is clear and convincing evidence that he cannot meet child's significant needs. Child becomes anxious and upset at the sight of boxes in a living room because he fears moving; father's failure to maintain consistency and stability would trigger child's anxieties and related behavioral problems at a time when child has made progress in addressing those issues.

In addition, child needs a parent who can manage a complex schedule of appointments with therapists and service providers. Child's foster mother, Catherine, missed 348 hours of work in one year to ensure that child received the care that he needs. Child requires a consistent level of care to avoid regression. Father's conduct shows that he cannot provide such care, and his conduct thus is seriously detrimental to child.

■        Under the circumstances, DHS made reasonable efforts to assist father in addressing his conduct. *See* ORS 419B.504(5). DHS made extensive efforts to offer services and referrals for more than two years before father was incarcerated, but father did not complete any services. Later, DHS offered a psychological evaluation in fall 2006 (when DHS and father's attorney could not agree on an evaluator) and again, after further discussions, in May 2007 (when father failed to show up for the appointment). After father's release from prison in December 2006, DHS offered parenting classes (which father never took) and referrals to VoA for outreach and drug and alcohol screening (which father engaged in only intermittently). Although father may have legitimate complaints about not being offered services while in prison or being offered services slowly, those complaints do

not change our analysis because father failed to engage in those services when they were offered. Although DHS could have made greater efforts to provide services while father was in prison, its efforts over the life of this case, including the period after father's release from prison, were reasonable.

■     We next consider whether father might be able to meet child's needs within a reasonable time. *See* ORS 419B.504(5). Given father's failure to adjust his circumstances over the past five years, his conduct after his release from prison, and child's pressing need for permanency and stability, we conclude that father will not be able to successfully parent within a reasonable time.

■     We finally turn to the best interests analysis. Father and child have no relationship, and child experiences severe anxiety in response to any change in his circumstances. Father cannot provide child with the care he needs. In contrast, child has made excellent progress in the care of his foster parents, is securely attached to them, and wants to be adopted by them. That outcome is in child's best interests.

     Affirmed.