Submitted June 5, affirmed November 26, 2014

In the Matter of A. W.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

S. W.,
*Appellant.*

Wasco County Circuit Court
J10017;
Petition Number J1001702;
A155971

340 P3d 675

Peter Gartlan, Chief Defender, and Shannon Flowers, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Karla H. Ferrall, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

GARRETT, J.

Ortega, P. J., dissenting.

## GARRETT, J.

Father appeals a judgment of the juvenile court that changed the permanency plan for father's biological daughter, A, from reunification to adoption. Father raises seven assignments of error. The assignment upon which we focus is father's contention that the juvenile court erred in concluding that the Department of Human Services (DHS, or the department) made "reasonable efforts" to reunite father with A. For the reasons that follow, we disagree with father, reject his other assignments of error, and affirm the judgment.

Father does not ask us to exercise our discretion to conduct *de novo* review, and we perceive no reason to do so. *See* ORAP 5.40(8)(c). Therefore, we "view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the [juvenile] court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013).

A was born in July 2009, prematurely, and has severe physical problems, including "unusual facial features," underdeveloped optic nerves in both eyes, musculoskeletal anomalies, and a congenital heart defect. In addition, A has had emotional problems throughout her life, stemming from a "diminished sense of trust in her caregivers." She is prone to injuring herself and has violent outbursts toward others.

DHS became involved in A's life in March 2010, when she was eight months old, and placed A in protective custody in April 2010. Since then, A has moved between her mother's care and foster care several times because of mother's substance abuse and physical abuse of A. Father has been absent for nearly all of A's life. He was convicted in June 2009, one month prior to A's birth, of delivery of methamphetamine within 1,000 feet of a school, and was on probation when A was born. In November 2009, father's probation officer recommended to the Wasco County District Attorney that father be arrested for various probation violations, including failing to report for a urinalysis test. Six days later, father was charged with reckless driving and eluding a police officer; he was convicted of those crimes.

When DHS opened this case in March 2010, father had been incarcerated for the previous four months. DHS actively facilitated father's transfer into a treatment program. In May 2010, DHS workers picked father up from jail and drove him to Portland, where father entered a residential substance abuse treatment center operated by the Salvation Army. During father's stay at that program, DHS arranged for A to visit him three times, and the department's Addiction Recovery Team (ART) met with father on five other occasions. At those meetings, DHS encouraged father "to work his treatment program, obtain a sponsor, and work with his sponsor on the steps [of Alcoholics Anonymous (AA)]." DHS also encouraged father to place himself on the waiting list for the Salvation Army's "extended housing" services and to "explore as many job opportunities as possible." DHS also provided father with a "letter of expectation"[1] informing father that, among other things, he needed to demonstrate his understanding of the effect of his drug and alcohol use on A, complete treatment, establish and maintain a safe and stable home, curb his impulsive and criminal behavior, and learn how to safely care for A.

The juvenile court entered a judgment of jurisdiction in June 2010; the allegations as to father were that his "use of controlled substances and/or alcohol affects his ability to adequately parent [A], which places [her] at risk of harm" and, further, that father "is currently incarcerated, which disrupts and compromises his ability and availability to adequately and appropriately parent [A]."

Although some early DHS case notes observed that father was "doing well" in the Salvation Army program, later notes reflect that, more than halfway through his residency, father had "not begun the first step" and that he had "reported that reading a [treatment-related] book isn't that relevant to him" because he did not "find it interesting." During a September 2010 meeting between father and the

---

[1] A "letter of expectation" is

"an individualized written statement for the family of the child *** that identifies family behaviors, conditions, or circumstances that resulted in an unsafe child; the expected outcomes; and what the Department expects each parent or legal guardian will do to achieve safety, permanency, and well-being of the child or young adult in the parental home."

OAR 413-040-0010(6)(b).

DHS team, father said that he had met with a sponsor only once and had still not filled out the required paperwork to officially designate his sponsor. Father later told DHS that he had graduated from a program, but that report is not corroborated by other evidence in the record.

When father was released from the Salvation Army program in November 2010, he stopped communicating with DHS. He surfaced long enough in December 2010 to ask the department to pay for a bus ticket so that he could visit A and her mother in Baker City, where mother was in residential treatment. DHS agreed to obtain the funds, but father disappeared again before the travel arrangements could be made. The visit did not happen.

In January 2011, approximately 40 days after his release from the Salvation Army program, father was arrested and jailed in Washington on charges of driving while intoxicated, attempting to elude police, and biting a state trooper. Father's Oregon probation officer informed DHS that, after serving time in Washington, father would be in jail in Oregon for "quite a while" for violating probation.

Father was incarcerated in Washington from January 2011 through March 2012. The record does not indicate that DHS made contact with Washington prison officials to determine what services were available to father or whether visits by A were feasible. DHS did call father in July 2011 and informed him that A had been removed from mother again and placed in foster care. Father suggested his brother as a possible placement option, but DHS determined that that placement was not a viable option. Father also informed DHS that he would be serving 45 months in prison. In December 2011, DHS sent father another letter of expectation directing him to participate in available programs such as substance abuse treatment, parenting classes, and a moral recognition or "thinking errors" class. While in Washington, father completed about five months of substance abuse treatment and obtained a GED.

In March 2012, DHS returned A to mother's care. At around that time, father was transferred from the Washington prison to the Northern Oregon Regional Correctional Facilities (NORCOR) to await sentencing for

his Oregon probation violation. In April 2012, father's attorney sent father's caseworker an e-mail note stating that "[father] would still like you to come see him. He would like pictures of his daughter and to talk about possible phone visits." DHS met with father at NORCOR five days later and, among other things, instructed him that he could call DHS collect when he wished and that he should tell DHS when he knew where he was being transferred. There is no indication that father ever took advantage of the invitation to call. At the meeting, father asked for a picture of A. The DHS caseworker noted, however, that father "talked about [mother] rather than his daughter."

Father was transferred to the Oregon State Penitentiary (OSP) in August 2012. In December 2012, DHS called father to discuss A and to inform him that A had been removed from mother again and placed in foster care for the third time. During that call, DHS suggested that father "take advantage of all programs that are available to him including alcohol and drug, parenting classes, and [P]athfinders or other programs that address criminal thinking." Father told DHS that he would like more regular "check-ins" and provided DHS with the name of a person at OSP who could arrange telephone conferences. The record does not indicate that DHS made contact with that person; the DHS caseworker later testified that she assumed that father would contact DHS if he wanted to discuss anything.

In February 2013, DHS sent father a third letter of expectation, reiterating that father should participate in services that were available to him. In April 2013, DHS arranged for a psychological evaluation of father by Dr. Sweet, who concluded that father did not understand A's special needs and that he had a "very vague and ineffective plan to try to develop a relationship with [A]." Sweet further opined that father would not be able to parent A within a reasonable amount of time and that Sweet was "not even sure if it would be appropriate for [father] to be considered a visitation resource." Sweet also explained that DHS "would be asking [A] to put her developmental life on hold on the possible hope that father could get his act together, which he hasn't been able to do for many years." Through that evaluation, DHS also learned that father, after he finished serving

his sentence in Oregon, would be returning to Washington to complete 19 months of substance abuse treatment as part of his post-prison supervision in that state.

In light of the April 2013 psychological evaluation, DHS decided against visits, concluding that they were not in A's best interests because of the stressful, six-hour round trip to OSP (especially in light of A's fragile state) and because Sweet's evaluation raised doubts that visitation would even be appropriate with father. DHS also concluded that in-person visits or telephone calls would be confusing for A because she did not know father.

In September 2013, DHS filed another dependency petition; the jurisdictional allegations as to father were amended to assert that, "[d]ue to father's criminal history, incarceration and lack of relationship with his daughter, he needs assistance of the court and DHS in establishing a safe relationship with his child." That same month, DHS encouraged father in a telephone call to write letters to A. In October 2013, father's attorney informed DHS that it had "an obligation to provide [father] with services and visits." DHS responded that, because father had been incarcerated the majority of A's life, she did "not know him." DHS further explained that "visits face to face or by phone are not in [A's] best interest and would confuse her," reiterated the recommendation that father should write letters, and noted that he still "ha[d] not done this." Father subsequently wrote, and DHS delivered, and read aloud to A, four letters from father to A during October and November 2013.

In November 2013, evidently for the first time, DHS contacted father's prison counselor. The juvenile court found that the contact was "most likely in preparation for [the permanency] hearing." During that conversation, DHS inquired about the possibility of future visits by A and discussed with father's counselor that he would need to request a private room for any potential visits due to A's fragile state and the chaotic nature of large, family visitation areas at the prison. DHS spoke with father's counselor once more before the permanency hearing and was informed that father had completed the Pathfinders program to address criminal thinking and was participating in a parenting class and a Native American sweat lodge support group.

The juvenile court held a permanency hearing in November 2013. At that time, father was scheduled to be released from OSP within three months, after which he was to return to Washington to complete 19 months of supervised post-prison substance abuse treatment.

At the hearing, DHS recommended that the court change the permanency plan from "return to parent" to "adoption" because father had "not made sufficient progress throughout this case in order to have [A] safely returned to his care." Evidence was also presented that father did not participate in AA or Narcotics Anonymous (NA) meetings while at OSP, despite DHS's direction to do so. Father testified that AA/NA meetings conflicted with the weekly meetings of his sweat lodge, but the evidence indicated that other AA/NA meetings were available that did not conflict with his sweat lodge meetings.[2] A DHS caseworker also testified that it was DHS's position that "face-to-face visits and phone call visits [were] not in [A's] best interest."

At the conclusion of the hearing, the court determined that DHS had made reasonable efforts, father had not made sufficient progress toward meeting "the expectation of the child, and the child cannot be returned to her father's care in a time that would be reasonable for the child." The court also determined that DHS had made reasonable efforts to "reunify the family," noting that the department had provided

> "[f]or both mother and father, drug and alcohol evaluations and treatments and UAs and drug testing, the availability of the ART team, transportation for father, * * * psychological evaluations for mom and dad, * * * [and] supervised visits with the child[.]
>
> "* * * * *
>
> "With regard to dad, * * * [DHS] did provide regular letters of expectation, [it] did have conversations with father, [it] did have—actually go visit the father when he was incarcerated locally. All of those do add up to reasonable efforts.

---

[2] Father testified at the permanency hearing that he "wasn't sure" or "didn't know" of other AA classes offered at the prison. However, DHS testified, and DHS records reflect, that father's prison counselor told DHS that father was "aware" that there were other AA classes available to him that would not have conflicted with the sweat lodge meetings.

"With regard to visitation with the child, because of this child's unique medical and emotional situation, having been to [OSP], it's a frightening place to walk into, and I can't imagine bringing any four-year-old child into that penitentiary for visitation purposes. Let alone a child who would have to endure a three-hour trip just to get there * * * [.] Given the age and the special needs of this child, it would not be appropriate for her to visit the penitentiary."

The court ordered the permanency plan changed from reunification to adoption. Father appealed; mother did not appear at the permanency hearing and has not appealed the juvenile court's judgment.[3]

On appeal, father raises seven assignments of error. We reject the first, second, third, and fourth assignments without written discussion except to note that they all rest on father's contention that permanency proceedings have two distinct "phases"—an adjudicatory phase and a dispositional phase—for purposes of the exception to the rules of evidence set out in ORS 419B.325(2).[4] After briefing in this case was completed, we issued *Dept. of Human Services v. J. B. V.*, 262 Or App 745, 754-55, 327 P3d 564 (2014), which rejected that contention. In light of *J. B. V.*, father's first four assignments of error necessarily fail.

Father's sixth assignment of error asserts that the juvenile court erred in concluding that father's progress toward reunification was insufficient. Father presents no argument on that issue, however, and, in any event, he did not preserve it below. *See* ORAP 5.45(1). His seventh assignment of error contends that the juvenile court erred in changing the permanency plan to adoption. That assignment is wholly predicated on father's fifth assignment of error regarding the juvenile court's "reasonable efforts" determination. Accordingly, the remainder of our discussion concerns that issue.

---

[3] DHS "has not seen or heard from [mother]" since December 2012.

[4] ORS 419B.325(2) provides that, "[f]or the purpose of determining proper disposition of the ward, testimony, reports or other material relating to the ward's mental, physical and social history and prognosis may be received by the court without regard to their competency or relevancy under the rules of evidence."

At a permanency hearing, prior to changing a case plan from reunification to adoption, the juvenile court must

"determine whether [DHS] has made reasonable efforts or, if the Indian Child Welfare Act [(ICWA)] applies, active efforts to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

ORS 419B.476(2)(a); *see also State ex rel Dept. of Human Services v. Shugars*, 208 Or App 694, 711, 145 P3d 354 (2006). Whether the department's efforts are reasonable "depends on the particular circumstances." *Dept. of Human Services v. M. K.*, 257 Or App 409, 416, 306 P3d 763 (2013) (citing *State ex rel SOSCF v. Frazier*, 152 Or App 568, 582, 955 P2d 272, *rev den*, 327 Or 305 (1998)).

DHS must provide parents with "a reasonable opportunity 'to demonstrate their ability to adjust their conduct and become minimally adequate parents * * *.'" *M. K.*, 257 Or App at 417 (quoting *Shugars*, 208 Or App at 717-18). In determining what efforts are reasonable under the circumstances, relevant factors include "whether a parent has attempted to make appropriate changes in his or her life * * * and whether parents ignored or refused to participate in plans suggested by the state." *Shugars*, 208 Or App at 712 (citations and footnote omitted). An evaluation of reasonable efforts requires the court to consider "not only the burdens that the state would shoulder in providing those services, but also what benefit might reasonably be expected to flow from them." *M. K.*, 257 Or App at 416.

Dependency cases involving incarcerated parents present unique challenges. The department's ability to, for example, communicate with a parent, monitor a parent's engagement in services, and facilitate visits with the child may be severely tested when a parent is incarcerated. We have made it clear, however, that the mere fact of a parent's incarceration does not excuse DHS from making the reasonable efforts required by statute. *See State ex rel Juv. Dept. v. Williams*, 204 Or App 496, 506, 130 P3d 801 (2006) ("[I]ncarceration of a parent, without more, is not an

aggravated circumstance that may serve as a basis for excusing DHS from making reasonable efforts toward reunifying the family.").

Thus, we have held that DHS failed to make reasonable efforts where the department's engagement with an incarcerated parent was "virtually nonexistent." *Id.* at 507. In *Williams*, for example, the father was incarcerated for approximately 16 months during the pendency of the juvenile proceedings involving his child.[5] He participated in "all the programs offered at the jail," including parenting classes and substance abuse and addiction support meetings. *Id.* at 499. He also completed his GED, applied to community college, completed an interactive self-help journaling program, and met weekly with a pastor. *Id.* He was unable to contact DHS from jail but made requests, through his attorney, that DHS get in touch with him. We noted that, in response, over the course of 16 months,

> "DHS appears to have communicated with father only twice * * * [and] those two communications merely instructed father to contact DHS on his release. DHS's reports barely mention father, except to list 'face-to-face contacts' that appear to allude only to hearings in the case and to note that DHS had not contacted father and that father had not contacted the agency."

*Id.* at 507.

We concluded, particularly in light of the father's "relatively short incarceration, the lack of any information about his relationship with child, and his apparently imminent release from jail within four months of the permanency hearing," that DHS's efforts were not reasonable. *Id.*

Similarly, in *State ex rel Dept. of Human Services v. H. S. C.*, 218 Or App 415, 419-20, 180 P3d 39 (2008), the father had been cooperating fully with DHS's requirements during his child's dependency case. He was detained by federal authorities, however, and ordered deported to Guatemala.

---

[5] The father initially was incarcerated for four months while awaiting trial. During that time, the child was placed into protective custody. The father was sentenced to probation and was out of custody for about two weeks when he violated his probation and was subsequently sent to prison for about one year. *Williams*, 204 Or App at 498-99.

At the permanency hearing, the father testified by telephone that he would consider waiving his deportation appeal and voluntarily return to Guatemala if doing so would help him get his child back, because he understood that, under those circumstances, "DHS would be required to work with him." *Id.* at 419. The father also told the court that "he would continue to do everything that DHS asked him to do for his child if and when he was able to leave detention." *Id.* at 420. The record showed that, upon the father's detention, DHS had "ceased offering [the] father any services," then told him that the department would offer services in the event that he was deported to Guatemala by working with the consulate. *Id.* at 426. Five months later, at the permanency hearing, DHS testified that "no more services were available." *Id.* In concluding that DHS had not made reasonable efforts, we observed that it was not reasonable for DHS to expect the father to simply "comply with the existing case plan and service agreement" after he was detained, and that DHS had not inquired about the father's potential to complete his progress requirements while detained. *Id.* at 427.

In another case, however, we held that DHS made reasonable efforts to reunify an incarcerated mother with her children, even though DHS did not arrange for visits or offer treatment services to the mother. *See Dept. of Human Services v. D. L. H.*, 251 Or App 787, 801-03, 284 P3d 1233 (2012), *rev den*, 353 Or 445 (2013).[6] In that case, DHS made phone calls to the mother in prison; a DHS caseworker visited the mother and offered her a substance abuse evaluation, which mother declined; DHS communicated with the mother's prison counselor about the services that were available to her in prison; and DHS investigated whether it would be appropriate for the children to visit their mother in the prison. *Id.* at 801-02. We noted that DHS "had limited program options" due to mother's incarceration, that the department's investigation into whether to arrange visits by

---

[6] *D. L. H.* involved a mother's two children, one of whom was subject to the federal ICWA. In such cases, ORS 419B.476(2)(a) requires the juvenile court to determine whether DHS made "active efforts" to reunify the family. *D. L. H.*, 251 Or App at 798. "Active efforts" requires more than "reasonable efforts." *Id.* Because we concluded that DHS had made active efforts to reunify the Indian child with the mother, we also concluded that DHS had also made "reasonable efforts," a lesser requirement, as to the non-Indian child. *Id.* at 803.

the children to the prison were "efforts" towards reunification, even though no visits occurred, and that the mother had been offered drug and alcohol programs and "refused to participate." *Id.* at 801-03.

In this case, father's challenge to the reasonableness of DHS's efforts focuses on the period of approximately 33 months between January 2011 (when father was incarcerated in Washington) and September 2013, shortly before the permanency hearing. Father contends that, during that period, DHS made "at best, only minimal efforts" toward reunifying A with him. Specifically, father objects to (1) DHS's failure to contact father's prison counselors to discuss the availability of services to father, and (2) the fact that DHS, in father's view, made "no attempt" to explore the possibility of having A visit father in prison. DHS counters that its failure to contact the prison counselors or to arrange for visitation is not significant in light of the circumstances and the other efforts that DHS did make, and that, under the totality of the circumstances, the agency made reasonable efforts to "give father a reasonable opportunity to demonstrate that reunification with [A] was possible in a realistic period of time."

This is a difficult case, in part, because DHS's level of effort toward father during the period that he highlights was hardly vigorous. On appeal, DHS reminds us that its "options for arranging training, treatment or other suitable services for a parent are significantly constrained when that parent is in jail or prison," and that it can often do little more than encourage a parent to take advantage of the services that are available, which was done in this case. Even accounting for the logistical difficulties arising from father's prolonged incarceration both in and out of state, however, it seems clear that DHS could have done more. During those 33 months, the department's level of engagement was something more than "virtually nonexistent," (unlike *Williams*, in the present case, DHS sent letters of expectation, had two telephone calls and one meeting with father, encouraged him to write letters to A and delivered those letters, and arranged for the psychological evaluation by Sweet), but less than ideal. DHS presumably, with little effort or expense, could have arranged for more regular

telephone calls with father and communicated with prison officials to check on the availability of, and father's participation in, services. Instead, lengthy periods elapsed without any contact.

But the juvenile court was not concerned solely with what DHS did on father's behalf during those 33 months. The juvenile court was required to evaluate DHS's efforts over the life of this case, in light of the particular circumstances of father and A. Moreover, in evaluating the reasonableness of DHS's efforts, the juvenile court was expressly required to make A's health and safety the "paramount concerns." ORS 419B.476(2)(a). And father's own conduct and responses to the efforts that DHS did make also factor into the analysis. For example, in *State ex rel Juv. Dept. v. J. L. M.*, 220 Or App 93, 124, 184 P3d 1203 (2008), we held that DHS made reasonable efforts toward a father, who had been offered services both before and after incarceration, because, "[a]lthough DHS could have made greater efforts to provide services while father was in prison, its efforts over the life of this case, including the period after father's release from prison, were reasonable." We explained further that, "[a]lthough father may have legitimate complaints about not being offered services while in prison or being offered services slowly, those complaints do not change our analysis because father failed to engage in those services when they were offered." *Id.* at 123-24; *see also D. L. H.*, 251 Or App at 802 (reasoning that a mother's refusal to participate in services offered to her while she was incarcerated was relevant to the determination of whether DHS made reasonable efforts).

Here, the significant attempts that DHS made early in the case to engage father in treatment and develop a relationship between father and A support the juvenile court's conclusion that the department made reasonable efforts. When DHS first became involved on A's behalf in March 2010, father was incarcerated. DHS facilitated father's transfer to the Salvation Army program and personally transported him there. During father's stay at that program, DHS arranged for A to visit him three times, and ART met with father on five other occasions. DHS specifically encouraged father to participate in AA/NA.

Father did not respond to the department's efforts in a constructive fashion. He evidenced a disinterest in AA meetings, ended his contact with DHS when he was released from treatment, and walked away from an opportunity to visit A at DHS's expense. Then father committed new crimes and began a lengthy period of successive incarceration in Washington and Oregon, making him unavailable to parent A for, at a minimum, approximately two years following the permanency hearing.

Father's argument on appeal ignores those facts, focusing instead on the period after he was arrested in January 2011. We reject father's argument, for several reasons.

First, although father's analysis ignores the initial efforts that DHS made on his behalf prior to January 2011, and father's conduct in response to those efforts, that evidence was part of the totality of the circumstances for the juvenile court to consider in evaluating the reasonableness of the department's efforts over the life of this case.

Second, although the department could have made this an easier case by maintaining a greater connection with father following his incarceration in January 2011 (or by documenting reasons for not doing so), father does not explain how, even if DHS had had more contact with prison officials or called father more frequently, that would have furthered the statutory objective of allowing A "to safely return home." ORS 419B.476(2)(a). *See also M. K.*, 257 Or App at 416 ("[W]hen a parent complains that DHS has not provided adequate services, a court making a 'reasonable efforts' determination must consider not only the burdens that the state would shoulder in providing those services, but also what benefit might reasonably be expected to flow from them."). Nor is that a self-evident proposition, in light of father's lengthy incarceration at the time that A needed stability and permanency.

Third, there is no dispute that father knew what DHS expected of him. The record before the juvenile court demonstrated that DHS repeatedly conveyed to father that he needed to address his substance abuse issues. Although father participated in one program in Washington, he

declined to participate in AA/NA services after being transferred back to Oregon, despite their availability. That failure is particularly troubling given that father's pattern of criminal conduct derives from substance abuse and because DHS made it clear that father needed to participate in any programs tailored toward addiction treatment in order to facilitate reunification with A. This case thus differs from *H. S. C.*, for example, where the father fully complied with all DHS requirements before his immigration detention, but DHS failed to undertake any efforts after that detention began. This case more closely resembles *D. L. H.*, where the mother was offered services before being sent to prison but opted not to take advantage of them, and DHS was unable to provide additional services to mother while she was incarcerated.[7]

Fourth, father argues that DHS made no effort to explore the possibility of visits by A after January 2011. Father's argument, again, completely discounts the efforts that DHS made in the initial phase of this case to promote the development of a relationship between father and A; those efforts included three visits by A to the Salvation Army center and the department's offer to send father to visit A in Baker City, which father declined. After January 2011, the issue is more complex than father suggests. Starting in January 2011, father was incarcerated in Washington for more than a year. When DHS met with father shortly after his transfer to NORCOR in 2012, father evidenced little interest in A. The record also reflects that DHS made a considered decision that visits by A to OSP, after father was sent there in August 2012, were inappropriate. The factors in that decision were the long drive (six hours round trip from A's home) and the stress of the prison environment in light of A's particular physical, behavioral, and emotional

---

[7] The dissent asserts that our decision stands for the proposition that DHS is not required to make reasonable efforts unless a parent "earns" them. To the contrary, it is an important factor in our decision that DHS made extensive efforts toward father early in this case even though father had done nothing to "earn" such efforts. Our analysis merely reinforces the more modest proposition that a parent's conduct and response to services that are offered is relevant to the juvenile court's determination of whether DHS has made "reasonable efforts" under the totality of the circumstances. *See Shugars*, 208 Or App at 711-12; *J. L. M.*, 220 Or App at 123-24; *D. L. H.*, 251 Or App at 802-03.

problems; the lack of a relationship with father; and Sweet's April 2013 evaluation that questioned whether father was even a viable "visitation resource."[8]

Under those circumstances, DHS's decision not to send A to visit father at OSP does not evidence a failure to make reasonable efforts. We have held that the department's consideration of the possibility of visits is an effort toward reunification, even if the ultimate determination is that visits should not occur. *See D. L. H.*, 251 Or App at 801. And, again, in considering whether the department's efforts were reasonable under the circumstances, the court is required to make the child's "health and safety the paramount concerns." *M. K.*, 257 Or App at 416 (internal quotation marks omitted); ORS 419B.476(2)(a). Even if additional visits would have been desirable, father does not explain how they would have materially advanced his ability to reunify with A. *See M. K.*, 257 Or App at 416. The primary impediment to father's reunification with A has been his pattern of criminal conduct leading to imprisonment in Washington, then in Oregon, to be followed by a return to Washington for 19 months of substance abuse treatment. Father will be theoretically available to A in September 2015, at the earliest. By then, A will be six years old.

Finally, despite father's protest that DHS failed to bring A to see him, the record indicates that, during those 33 months, father made only a single request, through his attorney, for telephone visits with A, and that father made no effort to initiate contact with A until the department

___

[8] Father argues that DHS did not make any effort regarding visits by A from January 2011 through November 2013, when a DHS caseworker contacted father's prison counselor. It is true that the department's first contact with the prison counselor was in November 2013, but the record does not establish that that was the first occasion in which DHS considered the possibility of visits. DHS testified at the permanency hearing that there were several reasons why visits were considered inappropriate, including the April 2013 Sweet evaluation. The record also suggests that one of the reasons why DHS encouraged father to write letters to A, which occurred *before* November 2013, was to develop a relationship with A in order to make future visits possible. Thus, viewing the evidence (as we must) in the light most favorable to the juvenile court's disposition, *see N. P.*, 257 Or App at 639, a reasonable interpretation of the record is that DHS considered the possibility of visits by A well before November 2013, and that the conversation in November 2013 was for the purpose of discussing how future visits might work if DHS deemed them appropriate.

encouraged him, more than once, to write her letters. The fact that the statute requires DHS to make "reasonable efforts" does not mean that the responsibility for developing a relationship between parent and child is the department's alone. Father's failure to demonstrate much, if any, interest in A throughout most of this case is a factor that the juvenile court could consider in evaluating father's complaint that the department did not do more.

The dissent characterizes our opinion as endorsing a view that DHS need not invest in further services for a parent who faces a lengthy period of incarceration. We endorse no such *per se* rule. We simply recognize that the length and circumstances of a parent's incarceration are factors that the juvenile court may consider in determining whether DHS has made "reasonable efforts" to allow a child to "safely return home." ORS 419B.476(2)(a); *see also Williams*, 204 Or App at 507 (specifically noting the father's "relatively short incarceration" and "his apparently imminent release from jail within four months of the permanency hearing" in concluding that the department's efforts were not reasonable). The prospect for a child's safe return to a parent who is incarcerated depends, among other variables, on the length of time that the parent will be incarcerated, juxtaposed against the child's stage of development and particular needs. Thus, to prohibit the juvenile court from considering the length of incarceration in evaluating the reasonableness of DHS's efforts would be illogical, impractical, and inconsistent with the text of the statute, which expressly subordinates the question of "reasonable efforts" to the "paramount concern" of the "ward's health and safety." ORS 419B.476(2)(a).

In conclusion, the issue before us is whether the record, viewed in the light most favorable to the juvenile court's disposition, is legally sufficient to support the court's determination that the department made reasonable efforts over the life of this case, keeping in mind the "paramount concern" of A's welfare. Considering the totality of the circumstances, including the department's early efforts, father's pattern of conduct, the specific circumstances of his incarceration, the potential benefit of the additional efforts that father contends should have been made, and the needs

of A, we conclude that the record is legally sufficient to support the juvenile court's disposition.

Affirmed.

**ORTEGA, P. J.,** dissenting.

The question before us is whether DHS made reasonable efforts to reunify father and his four-year-old daughter, A. However, the majority alternately dodges that question and reframes it as an inquiry into father's behavior. The requirement of reasonable efforts, if approached in the manner undertaken by the majority, allows DHS to gamble against making such efforts if it appears that a parent is unlikely to be worthy of its investment of time. Because the reasonable efforts requirement has no meaning if so interpreted, I respectfully dissent.

My first problem with the majority opinion is with its statement of the facts, which are rendered as though we are evaluating whether father can now be reunited with his daughter within a reasonable time. That is not the question before us. To change a permanency plan from reunification to adoption, the court must find that DHS "has made reasonable efforts * * * to make it possible for the ward to safely return home *and*" that the parent did not make sufficient progress to allow for the child's safe return home. ORS 419B.476(2)(a) (emphasis added); *State ex rel Dept. of Human Services v. Shugars*, 208 Or App 694, 711, 145 P3d 354 (2006). The parent's progress is evaluated only where DHS has made reasonable efforts, not as a prerequisite to making such efforts.

Further, although we have said that the determination of what efforts are reasonable under the circumstances includes a consideration of "whether a parent has attempted to make appropriate changes in his or her life * * * and whether parents ignored or refused to participate in plans suggested by the state," *Shugars*, 208 Or App at 712 (citations omitted; footnote omitted), that does not and cannot mean that we begin the inquiry with whether the parent has behaved appropriately throughout the proceedings. The parent does not earn the right to reasonable efforts, and a

parent's failure to engage consistently early in a case cannot excuse the cessation of efforts by DHS as the case proceeds.

Buried in the majority's recitation of father's failures are these facts about DHS's efforts. In May 2010, a month after A was removed from mother's care, father was released from jail and DHS transported him to residential substance abuse treatment at a Salvation Army Adult Recovery Program. DHS brought A to visit father there on three occasions over the next three months. During that time period, DHS provided father with a "letter of expectation" informing him that, among other things, he needed to demonstrate his understanding of the impact on A of his drug and alcohol use, complete treatment, establish and maintain a safe and stable home, curb his impulsive and criminal behavior, and learn how to safely care for A. DHS and the Recovery Team (ART) met with father on five occasions between June and October 2010 and, during those meetings, DHS "encouraged [father] to work his treatment program, obtain a sponsor and work with his sponsor on the steps [of] Alcoholics Anonymous (AA)."

Father's efforts during those early months were indeed inconsistent. He told DHS and ART in September that he had not taken steps to obtain an AA sponsor and that the AA course was not relevant to him and he did not find it interesting. However, in October he informed them that he was seeing his AA sponsor three times a week and attending meetings, and he later reported that he had graduated from the Salvation Army program in November. Father was briefly out of contact with DHS until, in December, he sought assistance with travel expenses so that he could visit A, who was then living with her mother. DHS approved his request for funds for a bus ticket, but father again stopped communicating with DHS before travel plans could be finalized. DHS's efforts appear to have been reasonable for the period between May and December 2010.

However, DHS had very little contact with father for the next 33 months, following his arrest and incarceration in January 2011. During that period, DHS only called father twice, met with him once, and sent him two letters of expectation. It did not contact the facilities where he was

incarcerated to determine what services were available or to encourage his participation in services. Most importantly, it made no inquiry regarding the possibility of visitation between father and A, nor did it attempt to foster that relationship in any way.[1]

During DHS's few contacts with father, the agency merely suggested that he participate in services and keep DHS informed of his release date. As we noted in *State ex rel Juv. Dept. v. Williams*, 204 Or App 496, 507-08, 130 P3d 801 (2006), DHS "could have assessed father's parental strengths and deficiencies [and] could have explored services available to father * * * [and] monitored father's progress through his corrections counselor or another employee of the [prison]." It made no such efforts; contrary to the majority's view, 267 Or App at 289, DHS's efforts were, indeed, "virtually nonexistent," as in *Williams*, 204 Or App at 507.

In excusing DHS's apparent decision to cease working with father in early 2011, the majority focuses on father's "anemic response" to DHS's early efforts and his criminal conduct which resulted in a further incarceration. That analysis is flawed for several reasons. First, father did not entirely fail to engage in services as the majority suggests. Although he did indeed express early disinterest in treatment, he then reportedly obtained a sponsor and completed his recovery program before reoffending. While in prison, father obtained his GED, completed four months of substance abuse treatment, participated in a Native American sweat lodge, and requested further contact from DHS.

Moreover, father's early inconsistent responses to treatment are par for the course for addicted parents. Taken to its logical conclusion, the majority's approach would excuse DHS from making reasonable efforts in virtually every case involving a parent with a drug or alcohol problem. Given that the court takes jurisdiction only in cases where parents are functioning in a manner that presents a risk of harm to the child, ORS 419B.090(2)(a)-(b); ORS 419B.150(a); ORS

---

[1] DHS did not, as the majority asserts, "encourage [father] to write letters to A and deliver [t]hose letters" until the very end of the 33-month period. 267 Or App at 289. Further, as discussed below, the psychological evaluation by Dr. Sweet cannot fairly be described as a service to father. *Id.*

419B.157, it is not at all surprising that such parents very often participate inconsistently in services early on—yet some unpredictable number of parents step up participation as the case proceeds. The statute does not condition DHS's obligations on parental compliance and, indeed, doing so would be contrary to the statutory scheme, which calls for the state to do what it reasonably can to ensure that parental rights are preserved where a parent can be brought up to the standard of minimal adequacy. *Williams*, 204 Or App at 500; *State ex rel SOSCF v. Frazier*, 152 Or App 568, 582, 955 P2d 272, *rev den*, 327 Or 305 (1998).

Additionally, the majority's approach endorses DHS's apparent view that, once a parent is incarcerated for a period that will likely make him unavailable to parent for a period beyond a reasonable period for reunification, DHS need not invest in further services. To the contrary, our prior holdings that reasonable efforts are required even for incarcerated parents have not been conditioned on whether the parent's incarceration was likely to end soon. *See Dept. of Human Services v. M. K.*, 257 Or App 409, 417, 306 P3d 763 (2013) ("DHS must at least 'attempt[] to engage and work with' parents, even those who are incarcerated." (quoting *Williams*, 204 Or App at 508)). Nor should they be. As the Supreme Court has recognized, incarceration alone, even when reunification would not be possible for an extended period of time, is not necessarily a basis for termination of parental rights; while incarceration may indeed render a parent unfit, the parent's incarceration must also be shown to be seriously detrimental to the child. *State ex rel SOSCF v. Stillman*, 333 Or 135, 149-53, 36 P3d 490 (2001) (although the father's incarceration constituted a condition that could be sufficient to warrant a finding of unfitness, it did not qualify as such a condition where the evidence did not establish that it was seriously detrimental to the children given the family's strong extended family structure). It is not possible to predict the outcome for an incarcerated parent any more than for any parent—and even if it were, allowing DHS to gauge what efforts are reasonable by such predictions would be inconsistent with the statute's requirement of reasonable efforts and our recognition that such efforts must be made in every case.

There is a further problem with the majority's analysis: The majority evaluates DHS's efforts in light of father's circumstances at the end of a 33-month period of almost no effort by DHS. It was only toward the end of that period that DHS arranged for a psychological evaluation, and that evaluation cannot be fairly characterized as an effort on father's behalf, since it was not and could not have been used to determine what services would be most appropriate for father to engage in. Rather, that evaluation served entirely to bolster DHS's case against father, faulting him for a lack of relationship with A. When a child is in DHS custody, as A was, DHS should not be free to pin an incarcerated parent's lack of relationship with his child and lack of insight into his child's special needs entirely upon the fact of incarceration where it has made no efforts for nearly three years to assess how to facilitate the relationship between parent and child.

Moreover, DHS's late conclusion that the child could not tolerate visits does not shed light upon what type of contact might have been feasible for the preceding 33 months and cannot justify the lack of any evaluation by DHS of the efficacy of visits or other contact during those months. Even assuming, as the majority asserts, 267 Or App at 291, 293, that visits would not have affected father's availability at some future point likewise does not excuse DHS from assessing whether visits or other contact were possible. As noted, termination of parental rights is not inevitable in cases involving incarcerated parents. To evaluate DHS's efforts in light of father's current lack of relationship with his child gets the analysis backward, when DHS did not make any efforts to facilitate a relationship or even to determine whether and in what way that was possible during father's incarceration, until just before the permanency hearing.

This is not a case in which DHS's efforts were merely "less than ideal." 267 Or App at 289. For nearly three years, DHS's efforts were nearly nonexistent. Although DHS did not have the ability to affect what services were available to father while he was incarcerated, the record does not remotely suggest that DHS could not have determined what services were available and evaluated which ones would be most helpful in facilitating a determination of whether a

relationship with his child was possible within a reasonable time, and communicate that evaluation to father. The record likewise does not excuse DHS's failure to evaluate what, if anything, could be done to educate father about the child's special needs and to facilitate a relationship between father and the child during his incarceration. If the concept of reasonable efforts is to mean anything, it must consist of some efforts, and it must be evaluated from the standpoint of the period when the efforts would be made, not from the vantage point of an after-the-fact assessment of whether such efforts would have succeeded given the parent's status without such efforts.

I am mindful that, given father's lengthy incarceration and the conditions of his post-prison supervision, there were reasons early on to question whether reunification would be possible within a time frame that was reasonable for A. However, the requirement of reasonable efforts by DHS does not hinge on such an assessment early in the case, and the juvenile court may not make such an assessment at the permanency stage in the absence of reasonable efforts by DHS to facilitate reunification. Moreover, the statutory scheme does not automatically excuse DHS from making such efforts when a parent is incarcerated, even if that incarceration may make the parent unavailable for an extended period. The majority's conclusion otherwise relieves DHS of the burden of making reasonable efforts in many, perhaps a majority, of cases, and instead imposes on parents the burden of showing that such efforts would have been efficacious in their particular circumstances, as evaluated on a record where such efforts were not made. Because that conclusion is inconsistent with the statutory scheme and has troubling implications for cases beyond this one, I dissent.