682 April 3, 2024 No. 207

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of L. F.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*
*and*
L. F.,
*Respondent,*
*v.*
T. F.,
*Appellant.*

Columbia County Circuit Court
21JU01883; A182039

Denise E. Keppinger, Judge.

Argued and submitted February 2, 2024.

Kyle Sessions, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Office of Public Defense Services.

Inge D. Wells, Assistant Attorney General, argued the cause for respondent, Department of Human Services. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Kristen G. Williams argued the cause and filed the brief for respondent, L. F.

Before Shorr, Presiding Judge, Mooney, Judge, and Pagán, Judge.

MOONEY, J.

Reversed and remanded.

**MOONEY, J.**

Father appeals the juvenile court's permanency judgment that changed the permanency plan for his son, L, from reunification to adoption. He assigns error to the juvenile court's reasonable efforts finding, arguing that the decision to change the permanency plan was based on the incorrect legal conclusion that the Department of Human Resources (DHS) made reasonable efforts to return L to his father's home. We reverse and remand.

## THE STANDARD OF REVIEW

We review findings of fact—such as what DHS did or did not do—for any evidence. *Dept. of Human Services v. J. F. D.*, 255 Or App 742, 744, 298 P3d 653 (2013). We review conclusions of law—such as whether the facts support the conclusion that DHS made reasonable efforts—for legal error. *Dept. of Human Services v. R. W.*, 277 Or App 37, 39, 370 P3d 543 (2016).[1] We "view the evidence in the light most favorable to the court's disposition to determine if it supports the court's legal conclusions." *Dept. of Human Services v. S. J. M.*, 364 Or 37, 40, 430 P3d 1021 (2018). We draw the facts from the record that was before the juvenile court when it changed the permanency plan.

## THE FACTS

L was born in the state of Ohio in 2009. Father testified that L's mother left the state of Ohio with L when L was about two years old without telling father where they were going. Father has not been involved in L's life since L was a toddler. L had no memory of his father in 2021, when DHS removed L and his half-brother from their mother's care. L and his half-brother were placed with his half-brother's paternal aunt and uncle at or near the time they were removed, where L has resided ever since. DHS searched for L's father and located him in the state of West Virginia, where father had been living for many years. Father responded to DHS, voluntarily appeared at the jurisdictional trial in June 2021, and admitted that he needed the assistance of DHS to

---

[1] The parties have not requested *de novo* review.

establish a relationship with L. That admission became the basis of jurisdiction with respect to father.[2]

The permanency plan was reunification. The court ordered father to comply with "the terms of the Action Agreement"—which appear to have obligated him to participate in Zoom visits with L and to cooperate with a parent mentor. DHS was ordered to facilitate contact between father and L, to refer father to a parent mentor, to have ongoing contact with father, and to work with father "to determine appropriateness of placement with him."

Father and L began regularly scheduled remote visits that were, by all reports, positive and successful. DHS reduced the number of Zoom visits at L's request due to L's busy summer schedule, but regular visits continued to occur, albeit less frequently. Father was also referred to a parent mentor in Oregon, although the mentor soon closed his file after father failed to return a number of the mentor's phone calls.

Father was initially excited at the prospect of L coming to live with him in West Virginia. He spoke with L about visiting him there so that L could meet his large extended family. L was uncomfortable with the idea of travelling to West Virginia and he discussed that with the DHS caseworker at various times during the Fall of 2021. The case worker assured L that before approving a visit with his father in West Virginia, DHS would work with "Child Welfare in West Virginia to do a walkthrough of his dad's home."

In October 2021, DHS asked the West Virginia child welfare agency to "assess the appropriateness of [L] visiting [father] in the future, or potentially being placed with him." West Virginia responded by approving placement with father. DHS also received correspondence from an Ohio child welfare agency that included agency history with father. That information included a number of unsubstantiated reports of maternal neglect concerning L in 2010 and 2011. There was also a letter that summarized a sequence

---

[2] There were several jurisdictional bases established with respect to mother that we do not include in our discussion because L's mother is not a party to this appeal.

of reports between 2015 and 2016 concerning father's older children from a prior relationship that ultimately resulted in agency involvement that continued until the children aged out of the system.

The caseworker arranged to fly father to Oregon so that he and L could meet in person and spend some time together here. That trip was scheduled for November 2021; however, father did not board the plane to travel to Oregon and, for reasons that are not clear, the trip did not happen. Father apologized to L for missing the flight and said that he still planned to travel to Oregon for a visit, although such a trip had not occurred by the time of the permanency hearing in June 2023. Zoom calls occurred less often and the relationship between father and L deteriorated after the failed visit to Oregon.

L participated in a psychological evaluation conducted by Dr. Munoz in March 2022. Munoz diagnosed L with an unspecified anxiety disorder and "strongly encourage[d] some system whereby the father has to check in to confirm the visits so as not to disappoint [L] with another no-show."

The DHS caseworker assigned to L's case, Bolden, wrote to father in April 2022 about the missed visits and directed father not to talk to L about the possibility of L moving to West Virginia to live with him there.[3] L had requested that the remote visits be decreased in number and Bolden enclosed a "visitation contract" with her

---

[3] The DHS caseworker and L had discussed West Virginia a number of times and by May 2022, the DHS caseworker had "confirmed" with L that he did not want to live with his father in West Virginia. By July 2022 the caseworker "explained to L that DHS was going to continue to advocate for L's desire to stay with his resource parents, and not move with his dad to West Virginia." Later that fall, DHS asked Munoz to "briefly interview [L] as he recently has indicated a desired change in plan from guardianship to adoption." Munoz reported that L told him that his visits with his father "don't go bad, but I don't really connect with him, and we don't talk about anything important." Munoz concluded that L's "feelings and wants" ought to "be taken into consideration." We note that the permanency plan continued to be reunification until the summer of 2023 and, to the extent that the case management approach employed by the caseworker was at odds with that plan and may be relevant to father's argument that DHS "undermined" his relationship with L, we presume that the juvenile court found otherwise. Because we resolve this appeal on the lack of reasonable efforts made by DHS with respect to the new jurisdictional bases added in February 2023, we need not, and do not, address that argument further.

communication to father that, among other things, decreased the number of visits according to L's wishes. Bolden conditioned further contact between father and L on father returning the signed contract to her. There was a remote meeting in May 2022 that was, by all accounts, not productive, and father did not return the proposed agreement. Visits nevertheless continued until October 2022, when L requested that they be discontinued.

DHS filed an amended petition in late September 2022 that raised new jurisdictional allegations against father, including that father lacks impulse and behavior control in L's presence, that father does not understand L's emotional needs, that he fails to keep in regular contact with L, that he makes it difficult to build trust and a secure bond with L, and that he fails to recognize or understand the impact of his failures on L. The jurisdictional trial on the amended petition was held in February 2023. Father appeared on the first day of trial but did not return for the final day. The juvenile court found that DHS had established the new allegations by the requisite burden of proof, and it continued its dependency jurisdiction over L with a permanency plan of reunification. The court stated that father had "failed miserably" in his attempts to "connect" with L, and that it would be important to discover any "barriers" that are "causing [father] to be unable to communicate or understand what DHS is saying to him as far as coaching him to improve the way that he communicates with his son." Although DHS withdrew its request to the court that it order father to submit to a psychological examination, the court ordered that father submit to such an examination and that father's participation in both a psychological examination and a mental health assessment "would be necessary before any reunification therapy could get started." The court also found that it would be "detrimental" to L and father's relationship to order visitation to resume, but instead ordered father to write letters to L and to maintain "regular consistent contact" with the DHS caseworker.

A new DHS caseworker, Hickingbottom, was assigned to L's case, and she called father and left a voicemail shortly after the second trial. When father did not

return her call, Hickingbottom emailed father to arrange a time to talk. She provided father with her contact information and the new court orders. Father did not respond and Hickingbottom sent him another email the next month. Father responded by asking for a meeting and, after a brief back-and-forth, the meeting was not arranged, and father stopped responding to Hickingbottom's monthly emails.

Six months after the jurisdictional trial, the court conducted a required permanency hearing under ORS 419B.470(6). At the hearing, DHS requested that the court change the permanency plan from reunification to adoption. Father did not attend the hearing, although his attorney did, contending that DHS had not used reasonable efforts to assist father in ameliorating the new bases of jurisdiction, and opposing the change in plan. Hickingbottom testified that father had not engaged with her since March, that father had not written to L, and that she had not "seen any effort on father's part since the last hearing." Ultimately, the juvenile court found that there was a "lack of attempted engagement between father and son at this time," and that DHS's efforts at making reunification went "very above and beyond." Because it found that DHS had "made reasonable efforts to work towards reunification," and that father had "made insufficient progress to make it possible for [L] to return" to father's care, the court ordered that the case plan be changed to adoption. On appeal, father argues that DHS "undermined" his relationship with L and that it "fail[ed] to provide father with any services geared toward the new jurisdictional bases[.]"

## THE LAW

The juvenile court may not change the permanency plan to something other than reunification unless DHS proves, by a preponderance of the evidence, that DHS made reasonable efforts to make reunification possible, and that notwithstanding those efforts, the parent failed to make sufficient progress toward reunification. ORS 419B.476(2)(a); *Dept. of Human Services v. S. M. H.*, 283 Or App 295, 305, 388 P3d 1204 (2017). "[T]he reasonable-efforts inquiry focuses on DHS's conduct, and a parent's resistance to DHS's efforts does not categorically excuse DHS from making meaningful

efforts toward that parent." *Id.* at 306. We measure the reasonableness of DHS's efforts "based on the totality of the circumstances." *Dept. of Human Services v. M. K.*, 257 Or App 409, 411, 306 P3d 763 (2013). We especially scrutinize the "period before the [permanency] hearing sufficient in length to afford a good opportunity to assess parental progress[.]" *Dept. of Human Services v. S. S.*, 278 Or App 725, 735, 375 P3d 556 (2016) (internal quotation marks omitted). Additionally, because we consider the child's health and safety as 'paramount,' ORS 419B.476(2)(a), we evaluate DHS's efforts "in light of the particular circumstances of [the parent and child]." *Dept. of Human Services v. S. W.*, 267 Or App 277, 290, 340 P3d 675 (2014); *Dept. of Human Services v. D. M. D.*, 301 Or App 148, 156, 454 P3d 838 (2019). Importantly, the reasonableness of DHS's efforts is measured "through the lens of the adjudicated bases for jurisdiction." *S. M. H.*, 283 Or App at 305 (internal quotation marks omitted).

## ANALYSIS

Father does not live in the State of Oregon, and there is no evidence that he ever did. His home is, and was, in West Virginia. DHS sought him out as L's father, and he voluntarily submitted to the personal jurisdiction of the Oregon court.[4] Initially, the sole factual basis for jurisdiction over L was the decade-long absence of contact with L and the associated lack of a relationship between them. We presume that the juvenile court deemed that the lack of a relationship presented a present risk of harm to L. Otherwise, the presence of a parent who is willing and capable of safely caring for his child would defeat dependency jurisdiction. *Dept. of Human Services v. W. A. C.*, 263 Or App 382, 394, 328 P3d 769 (2014). Father essentially agreed that he needed the agency's assistance to establish a relationship with L and, further, he agreed to work with DHS to make that happen. As DHS and father proceeded under the original jurisdictional basis, there were challenging issues related to (1) the geographic distance that separates Oregon

---

[4] The term "personal jurisdiction" as to father is used here in the more general sense that he did not resist the authority of the Oregon court over him as an individual party, as distinguished from the "jurisdiction" that the juvenile court exercised over L at the conclusion of the trial on the first dependency petition.

and West Virginia, and (2) the significant gap in time that had separated father from L.

Much has been made of the fact that DHS purchased a plane ticket for father and that father failed to use it. But even if father never intended to catch that plane to Oregon, and assuming that his failure to fly here frustrated DHS's efforts to reunify him with L, his failure to catch that plane did not excuse DHS from its obligation to continue to make reasonable efforts to reunify father with his son. *See* ORS 419B.340(5)(a) - (c) (setting forth specific circumstances that exempt DHS from making reasonable reunification efforts, including aggravated circumstances, certain convictions, and a prior involuntary termination, none of which apply here). In a somewhat similar case, we held that the father's move to Kentucky, standing alone, did not "relieve the department of the requirement to make reasonable efforts with respect to that parent." *J. F. D.*, 255 Or App at 750. We have likewise held that DHS's reasonable efforts obligation is not excused merely because a parent is incarcerated. *S. W.*, 267 Or App at 286-87.

The question is whether, under the totality of the circumstances, DHS made reasonable efforts to assist father in ameliorating the bases of jurisdiction, including those added in February 2023. DHS argues that the new caseworker reached out to father promptly by email, that father did not respond, and that he had not responded to the caseworker's predecessor in several months. And that, according to DHS, when considered in conjunction with the efforts expended on the original jurisdictional basis, constitutes reasonable efforts. We do not agree.

This case is similar to *J. F. D.*, where we concluded that DHS's request "that authorities in Kentucky perform a home study through the ICPC," without evidence of any follow up on that request, was insufficient to support a reasonable efforts finding.[5] *J. F. D.*, 255 Or App at 748. There was evidence here that DHS sent a follow-up letter to the

---

[5] As we explained in *J. F .D.*, although that case addressed the juvenile court's reasonable efforts determination at the dispositional stage of the proceeding, the use of the term "reasonable efforts" throughout the Juvenile Code indicates that the term's general meaning remains the same at all stages of such proceedings. 255 Or App at 749.

West Virginia child welfare agency, and there was testimony from the West Virginia caseworker who interviewed father, walked through father's home, and approved placement that there might have been some confusion about the scope of Oregon's request. But there is no evidence that DHS pursued West Virginia or Ohio, by additional letters, electronic correspondence or telephone, to resolve the confusion or to get the follow-up that the caseworker wanted. None of the jurisdictional bases that were later added appear to relate in any way to information obtained from either of those states, or to any concerns related to DHS's inability to obtain additional information from those states.

　　But even if a single letter following up on a placement approval from another state is reasonable when considered along with DHS's purchase of a plane ticket for father, the referral to a parent mentor, and the arrangement of Zoom visits with L, those efforts were directed to the original basis of jurisdiction and not to the new bases. The juvenile court did not address DHS's efforts to assist father on the new jurisdictional bases beyond a reference to father's failure to respond to the new caseworker's monthly emails. DHS does not identify—through its caseworker or any other representative—any efforts directed toward the new bases beyond those monthly emails and a single phone call. The caseworker's testimony focused on father's conduct—his failure to write letters, and his failure to respond to her emails. That focus is misplaced. As we have explained:

> "Although we generally consider the particular circumstances of a case, including the parent's degree of cooperation, the reasonable efforts inquiry is primarily directed toward DHS's conduct, not the parent's. *** We recognize that a parent's failure to sign releases or unwillingness to engage in services can hamper DHS's efforts; however, that alone is not one of the circumstances that legally excuses DHS from making reasonable efforts as to that parent. *** Therefore, in determining whether DHS made reasonable efforts, we consider a parent's lack of cooperation, but we evaluate such lack of cooperation within the context of DHS's conduct and the case circumstances."

*R. W.*, 277 Or App at 43-44.

Notably, the caseworker did not describe what efforts she made, for example, to determine why father was not sending letters to L or what, if any, assistance father needed to send letters. Did he need assistance with the mechanics of writing and mailing a letter? Did he need assistance with deciding what content to include or how to approach such a letter? The caseworker likewise did not describe what steps, if any, she had taken to help father comply with the court's *sua sponte* order to submit to a psychological evaluation. Given the court's unequivocal conditioning of any "reunification therapy" on a psychological evaluation, the absence of a referral for such an examination is significant. There was no evidence presented of any effort made by DHS to assist father with his impulse control issues, or to better understand L's emotional needs and build trust with him. Given that record, the additional jurisdictional bases, and father's geographic distance from Oregon, something more than an initial phone call and monthly emails was needed to support a finding that DHS made reasonable efforts. The record does not support such a finding here, and the juvenile court erred in concluding otherwise.

Reversed and remanded.