IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| IN THE MATTER OF THE PARENTAL RIGHTS TO: B.M. | ) ) ) ) | No. 35389-3-III (cons. with 35390-7-III; 35391-5-III and 35392-3-III |
| IN THE MATTER OF THE PARENTAL RIGHTS TO: L.M. | ) ) ) ) | |
| IN THE MATTER OF THE PARENTAL RIGHTS TO: A.M. | ) ) ) ) | UNPUBLISHED OPINION |
| IN THE MATTER OF THE PARENTAL RIGHTS TO: P.M. | ) ) ) ) | |

FEARING, J. — Lawrence Miller appeals an order terminating his parental rights to his four young children. On appeal, he argues, among other arguments, that the Department of Social and Health Services (DSHS) failed to offer a parenting assessment ordered by the dependency court. We disagree and affirm the terminations.

FACTS

Lawrence Miller and Esther Kean begat four children. Both names are

pseudonyms. This appeal concerns the termination of Miller's parental rights to the children, whose respective ages, at the time of the termination trial, were eight, six, four and three. The youngest and oldest children are boys. The two middle children are girls. The mother agreed to termination of her rights.

The once functional Miller-Kean family declined commencing in 2014. In July 2014, Lawrence Miller slashed Esther Kean's dress with a knife. Miller explained to law enforcement that he lacerated the clothing because Kean wore the dress to please another man. The State prosecuted Miller for the domestic violence assault. In September 2014, a caller expressed concern about the family to DSHS because of extended parental absences, domestic violence, and parental drug use. DSHS investigated the family, but took no steps to remove the four children in 2014.

On January 6, 2015, DSHS received a report that both Lawrence Miller and Esther Kean ingested methamphetamine and had not cared for the children in months. The children had resided at their grandmother's house, but the grandmother could no longer care for the children. On January 9, DSHS assumed custody of the children, placed them in a foster home, and filed a dependency action.

According to Axel Roy, the social worker initially assigned to the four children's case, the quartet of children, when placed in foster care, suffered the "worst case of head lice" that the social worker had seen. Report of Proceedings (RP) at 57-58. A colony of lice thrived in each child's woeful head, and each child suffered painful sores resulting

2

from scratching.  A physician found the children to be dehydrated.

Despite speaking with family members, DSHS, on January 9, 2015, could not locate Lawrence Miller.  Nevertheless, on January 13, 2015, Miller appeared at court for a shelter care hearing.  As Miller exited the courthouse, law enforcement apprehended him on an arrest warrant.

DSHS next interacted with Lawrence Miller in March 2015 when Miller appeared at court.  Miller then signed an agreed order of dependency.  The order required Miller to obtain a drug and alcohol dependency evaluation and a domestic violence assessment and to undergo any treatment recommended as a result of the evaluations.  The order also demanded that Miller undergo periodic urinalysis testing.  The order did not require any assessment of Miller's parenting skills because of the need for Miller to address his drug dependency and domestic violence.

After entry of the dependency order, DSHS social worker Kathy Bennett, recently assigned the case of the four minors, informed Lawrence Miller that she would initiate referrals for the ordered services.  She asked Miller to contact her during the next week to schedule the services.  Miller requested that Bennett arrange visitation with his children, and she thereafter scheduled two supervised two-hour visits per week.

Lawrence Miller, during the spring of 2015, visited his children only once.  Miller did not contact DSHS to schedule services.  During the spring, Kathy Bennett attempted to locate Miller without success.  Bennett contacted family members, called telephone

message numbers of Miller, sent messages on Facebook, monitored jail logs to discern if Miller entered jail again, and reviewed state computer databases to learn if Miller applied for government benefits.

In June 2015, the dependency court ordered Lawrence Miller for the first time to complete a parenting assessment and to follow any recommendations given resulting from the assessment. Social worker Kathy Bennett did not then schedule a parenting assessment because of a belief that Miller needed to address his drug use and domestic violence first.

In October 2015, social worker Kathy Bennett located Lawrence Miller in a Bonner County, Idaho jail, where he reposed based on unlawful possession of firearm charges. Bennett met Miller at the jail and spoke with Miller for an hour about his lack of communication with DSHS and his failure to engage in services. When Bennett stressed the need for Miller to engage in services, Miller responded "maybe." RP at 72, 81. When Bennett explained that avoidance of services would cause termination of parental rights, Miller wept. During the jail conversation, Miller confirmed the family's deterioration resulted from his use of methamphetamine. He then asked about the well-being of his children and requested photographs of them. Miller informed Bennett that he would leave jail soon because he expected the prosecution to dismiss the charges. Bennett urged Miller to contact her on his release.

During the October 2015 visit, Kathy Bennett did not address a parenting

assessment with Lawrence Miller because he had not seen his children in six months. According to Bennett a parenting assessment would not be beneficial until Miller overcame drug addiction and domestic violence tendencies. A parent's use of methamphetamine renders most services worthless.

The children's guardian ad litem visited Lawrence Miller in the Bonner County, Idaho jail on October 7, 2015. As Miller cried, he informed the guardian of missing his children. When the guardian questioned Miller about his failure to visit his children, Miller mentioned difficulty in seeing his children in a room under supervision.

We do not know the length of Lawrence Miller's stay in Idaho incarceration for the unlawful possession of a firearm charges. Kathy Bennett authored Facebook messages, in which she encouraged Miller to contact her when he left jail and to engage in services. Sometimes Miller responded with cursory replies. He never called Bennett.

In February 2016, Judy Warren substituted for Kathy Bennett as the social worker assigned to the four children's cases. In March 2016, Lawrence Miller called Judy Warren at DSHS and requested visitation with his four children. During the conversation, Warren asked Miller to undergo a chemical dependency assessment. Miller declined the assessment. Miller asserted that he completed an assessment in Idaho and the assessment rejected the need for treatment. Warren did not then request Miller to undergo a domestic violence assessment because the domestic violence instruction would be worthless until he gained sobriety.

5

Lawrence Miller visited his children on March 14, 2016. Judy Warren then handed Miller a letter that listed the services he needed to complete. The letter included referrals for chemical dependency treatment and for domestic violence services. The letter gave no referral for a parenting assessment, since a parenting expert cannot assess one's parenting skills when one is influenced by drugs.

Lawrence Miller visited the quartet of offspring on April 20. During the visit, Miller expressed that his busy schedule precluded services. Miller did not visit the children again until September.

At a review hearing on April 21, 2016, the dependency court, at the recommendation of the guardian ad litem, ordered that visits between Lawrence Miller and the children change to a therapeutic format. The guardian claimed that visits negatively impacted the children. Miller appeared at a visit with an exposed large knife on his hip, and the knife frightened one or more children. Judy Warren scheduled the first therapeutic visit for May 11, 2016, but Lawrence Miller failed to attend.

On June 13, 2016, Judy Warren sent Miller a letter requesting that Miller contact her with his availability so that she could schedule a parenting assessment. Although Miller had yet to complete chemical dependency training, Warren concluded that the parties were running out of time for a parenting assessment. Warren explained in her letter that, because the assessment would necessarily entail the presence of the four children, coordination of schedules was needed. Warren urged Miller to contact her

6

promptly. Miller never responded to the letter. The social worker never scheduled a parenting assessment.

On June 22, 2016, Miller entered jail again, this time for possessing methamphetamine. Judy Warren spoke with Miller by telephone on July 7, when Miller confirmed that he ingested methamphetamine before his arrest. Warren spoke with Miller on August 23, 2016, when the two discussed Miller's repeated incarceration and failure to participate in services. Warren wondered why Miller faced possession of methamphetamine charges when he claimed he needed no treatment. Miller responded that possession charges do not equate to ingestion of the controlled substance.

Between September 14 and October 18, 2016, Lawrence Miller participated in four therapeutic visits with his children. Miller also attended a permanency planning hearing in September. In late October 2016, Miller returned to the Kuna, Idaho jail on drug charges.

Judy Warren does not know if Lawrence Miller has ingested any controlled substance since his arrest in June 2016. Since the dependency, Miller has undergone no urinalysis.

In January 2017, Lawrence Miller, through Judy Warren, sent a letter to his children indicating his intent to continue to send letters. The letter also announced an intent to engage in any treatment available in the Kuna prison, including chemical dependency treatment. Social worker Judy Warren never contacted the prison or Miller

7

to learn the treatment options available or to discover what treatment programs Miller entered. Warren withheld contacting the prison or Miller because of a pending parental termination trial. As of the February 2017 termination trial, Miller had sent no additional letters.

Since the dependency, the two young girls have lived together in a foster home, where the caregivers wish to adopt them. The boys have resided together in another foster home, where the custodians also desire to adopt them. The children are attached to their respective foster parents and siblings. The distance between the two foster homes spans only two blocks. The brothers and sisters often socialize together.

PROCEDURE

On June 27, 2016, the State of Washington filed a petition to terminate Lawrence Miller's rights to his four children. The trial court conducted a trial on February 23, 2017 and March 3, 2017. Miller did not attend the trial because of his incarceration in the Kuna, Idaho, prison. DSHS did not know how long Miller would remain in prison.

During trial, the three social workers and the guardian ad litem testified. Social worker Judy Warren opined that Lawrence Miller was unfit to parent because of an untreated chemical dependency, unresolved anger, imposition of domestic violence, and an unstable lifestyle. Warren also testified that an earlier referral for a parenting assessment would have been futile because of Miller's continued drug addiction. Warren added that continuation of the parental rights of Miller would interfere with the children's

adoption by foster parents. According to Warren, termination of the parent-child relationship benefitted all four children. The guardian ad litem testified that termination served all children's best interests.

After hearing evidence, the trial court found that the State provided or offered all court ordered and necessary services. The court also found that Lawrence Miller's deficiencies as a parent would likely not be remedied in the near future so as to permit the children to return home. The court further found that Miller is currently unfit to parent the four children, that continuation of the parent-child relationship with each child diminishes his or her change for a permanent and stable home, and that termination of the parental rights serves the children's best interests. Two findings of fact read:

VII

Based on testimony at trial and on the above findings, the court finds that Mr. [Miller] is currently unfit to parent these children. There is no reason for the court to conclude that Mr. [Miller] has done or is doing anything to address the deficiencies that gave rise to the underlying dependency in this matter, and therefore this court finds that these deficiencies still exist and render Mr. [Miller] unfit as a parent. The court wishes to note that, while Mr. [Miller] was incarcerated for a significant part of the dependency, incarceration was not the primary barrier to his playing a meaningful role in his children's lives. His failure in this aspect was the result of his volitional behavior.

VIII

Continuation of the parent-child relationship clearly diminishes the children's prospects for early integration into a permanent and stable home. These children are in adoptive homes and have a right to speedy resolution of this dependency. It is not shocking to the court that these children are

9

currently placed in two foster homes; it would appear that the Department
and the foster parents have made every effort to support the sibling
relationships.

Clerk's Papers (CP) at 100-01.

The trial court concluded that the State provided clear and convincing evidence of

fulfillment of the statutory elements, found in RCW 13.34.180, to terminate a parent's

relationship with his children. The trial court ordered termination of Lawrence Miller's

rights to his four children.

After a reference hearing, the trial court added the following finding of fact:

> Any parenting assessment would have been futile in correcting
> [Lawrence Miller's] parenting deficiencies. . . . [Miller's] primary
> parenting deficiencies were drug abuse, specifically methamphetamine
> abuse, and domestic violence. While [Miller] did have issues in his
> relationships with his children which might have been addressed to some
> degree by his participation in a parenting assessment, these issues are
> properly considered as resulting from or at the very least related to his
> primary issues of drug abuse and domestic violence. Despite numerous
> attempts by DSHS social workers throughout the children's dependencies
> to engage [Miller] in services to address these primary issues, [Miller]
> consistently denied having these issues and refused to engage in services to
> address them.
> The purpose of the ordered parenting assessment (and of the
> therapeutic visits in which he did participate, albeit only four times) was to
> mend, maintain and strengthen his relationship with his children while he
> worked on his primary issues of drug abuse and domestic violence. Not
> only did [Lawrence Miller] fail utterly to address these primary issues in
> spite of social workers' persistent efforts to engage him in remedial
> services that might have been efficacious, he also failed to take advantage
> of opportunities to maintain his relationship with his children. He did not
> visit his children for months at a time. He failed to engage meaningfully in
> therapeutic visits with his children. He continued in criminal behavior that
> resulted in repeated incarcerations throughout the dependency, making him

unavailable to his children.

[Lawrence Miller's] participation in a parenting assessment under these circumstances would not have addressed his primary issues of drug abuse and domestic violence . . . .

CP at 494-95.

LAW AND ANALYSIS

Challenged Findings of Fact

We first address Lawrence Miller's assignments of error to discrete sentences in findings of fact V, VII, and XII that detail raw facts. The latter finding of fact incorporated as true all allegations in the petition to terminate parental rights.

Lawrence Miller contends in his opening brief that the evidence does not support findings, embedded in finding of fact V and in the petition for termination, that DSHS offered him a parenting assessment; that DSHS sent both parents a service letter providing information regarding the parenting assessment; that his last known address was Fourth Street in Oldtown, Idaho; that DSHS offered or provided him mental health treatment; that he failed to contact DSHS after his October 2016 incarceration; that he failed to visit his children after March 28, 2016; that the mother pled guilty to felony possession of a controlled substance; and that the mother's parental deficiencies include mental health issues and an inability to meet the children's physical and psychological needs. We agree in part with Lawrence Miller.

The dependency court ordered no mental health treatment, and the trial record

mentions no such treatment offered anyway.  Miller visited his children on five occasions after March 2016.  In January 2017, Miller either contacted Warren directly by letter or indirectly through a letter to his children.  The trial record lacks any mention of a last known address, but DSHS knew of Miller's imprisonment in Kuna, Idaho, at the time of trial.  A finding of fact without any support in the record cannot stand.  *Worthington v. Worthington*, 73 Wn.2d 759, 766, 440 P.2d 478 (1968); *Department of Licensing v. Sheeks*, 47 Wn. App. 65, 70, 734 P.2d 24 (1987).

We deem the factual errors mentioned in the previous paragraph inconsequential in our analysis as to whether the State met its burden of proof in terminating Lawrence Miller's parental rights.  We also ignore as unimportant those challenged findings that mention the mother's conduct or DSHS's provision of services for the mother.  We will hereafter address the sufficiency of the evidence to support the indispensable finding of facts of DSHS offering a parental assessment and sending a letter providing Lawrence Miller information regarding a parenting assessment.

Provision of Necessary Services and a Parenting Assessment

We now address whether the State established all elements of its petition to terminate Lawrence Miller's parental rights to his four children.  On appeal, Lawrence Miller contends the State failed to carry its burden in showing that it offered or provided all ordered and necessary services and the State failed to show the unlikelihood of his

12

parental deficiencies being remedied in the near future.  In so arguing, Miller emphasizes that the State refused to explore treatment options available for him in prison.

The right to parent one's child is protected by both the due process requirements of the Fourteenth Amendment to the United States Constitution, and by the Washington State Constitution article I, section 3.  *In re Welfare of Luscier*, 84 Wn.2d 135, 139, 524 P.2d 906 (1974), *overruled on other grounds by Lassiter v. Department of Social & Health Services*, 452 U.S. 18, 32-34, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981).  Before termination of parental rights, the State must establish the first six factors listed in RCW 13.34.180(1) by clear, cogent and convincing evidence.  RCW 13.34.190(1)(a)(i).  Clear, cogent and convincing evidence exists when the ultimate fact at issue is shown by the evidence to be highly probable.  *In re Dependency of K.R.*, 128 Wn.2d 129, 141, 904 P.2d 1132 (1995).

The following factors comprise the first six elements of RCW 13.34.180(1):

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That *the services ordered under RCW 13.34.136 have been expressly and understandably offered* or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
> (e) That there is little likelihood that the conditions will be remedied so that the child can be returned to the parent in the near future.  A parent's

failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. The presumption shall not arise unless the petitioner makes a showing that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided . . .

. . . .

and

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. If the parent is incarcerated, the court shall consider whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b); whether the department made reasonable efforts as defined in this chapter; and whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.

(Emphasis added.) Lawrence Miller challenges the State's fulfillment of RCW 13.34.180(1)(d) and (e). We focus on section (d)—the State, in part, must show by clear, cogent, and convincing evidence that it provided or offered all services ordered.

RCW 13.34.180(1)(d) requires the offering of services that the trial court ordered, regardless of their need, and all necessary services, regardless of whether the trial court ordered the necessary services. *In re Parental Rights to I.M.-M.*, 196 Wn. App. 914, 921, 385 P.3d 268 (2016). DSHS carries a burden to "affirmatively" offer or provide all required services; thus, DSHS must do more than merely recommend a service. *In re Welfare of Hall*, 99 Wn.2d 842, 850, 664 P.2d 1245 (1983). To meet its statutory burden,

14

DSHS must, at a minimum, provide the parent with a referral list of agencies or organizations that provide the services. *In re Welfare of Hall*, 99 Wn.2d at 850.

The trial record shows that a June 2015 order directed Lawrence Miller to complete a parenting assessment. Thus, at a minimum, DSHS needed to provide Miller with a referral list of an entity that conducted a parenting assessment.

Lawrence Miller disputes that DSHS offered a parenting assessment. Miller thereby challenges finding of fact V, which declares that the State offered all ordered services. Miller also challenges finding of fact XII, which incorporates the petition for termination's allegation that DSHS sent a service letter to the parent's last known address regarding contact information for a parenting assessment. Miller claims that DSHS possessed an inaccurate last known address for him, and he further contends that the record fails to establish that DSHS sent the purported letter.

Because of ambiguities in the trial record, this court remanded the case to the trial court for further testimony as to whether DSHS referred Lawrence Miller for a parenting assessment. On remand, the trial court entered a finding of fact that social worker Judy Warren sent a letter to Miller in June 2016 expressing the need for a parenting assessment and asking Miller to contact her. Substantial evidence, primarily a copy of the letter and Warren's testimony, confirms this finding of fact.

In a termination of parental rights proceeding, we bestow deference on the trial court's decision on review, and we uphold those findings of fact supported by substantial

evidence. *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999).

Substantial evidence exists when a sufficient quantity of evidence would persuade a fair-

minded, rational person that a finding is true. *Pham v. Corbett*, 187 Wn. App. 816, 825,

351 P.3d 214 (2015); *Hegwine v. Longview Fibre Co.*, 132 Wn. App. 546, 555-56, 132

P.3d 789 (2006), *aff'd*, 162 Wn.2d 340, 172 P.3d 688 (2007). The State must prove that

DSHS offered ordered services not by a preponderance of evidence but by clear, cogent,

and convincing evidence. Washington courts equate the "highly probable" standard of

proof to the "clear, cogent, and convincing" standard. *In re Welfare of Sego*, 82 Wn.2d

736, 739, 513 P.2d 831 (1973); *Thompson v. Henderson*, 22 Wn. App. 373, 376 n.2, 591

P.2d 784 (1979). When a litigant appeals findings subjected to this burden of proof, we

must resolve not merely whether substantial evidence exists to support the trial court's

ultimate determination of the factual issue but whether substantial evidence supports such

findings in light of the highly probable test. *In re Welfare of Sego*, 82 Wn.2d at 739.

When DSHS offers the services, but the parent fails to take advantage of them, the

State satisfies the requirement of RCW 13.34.180(1)(d). *In re Welfare of M.R.H.*, 145

Wn. App. 10, 26, 188 P.3d 510 (2008). The trial court, based on strong evidence, found

that Lawrence Miller failed to engage in all services offered, including assisting in

arranging for a parenting assessment.

The State cites a series of Washington decisions for the proposition that DSHS

need not offer services to a parent unwilling or unable to benefit by the services or when

16

the service would not have corrected parental deficiencies in the near future. *In re Welfare of Hall*, 99 Wn.2d 842 (1983); *In re Dependency of S.M.H*, 128 Wn. App. 45, 115 P.3d 990 (2005); *In re Welfare of M.R.H.*, 145 Wn. App. 10 (2008); *In re Dependency of T.R.*, 108 Wn. App. 149, 29 P.3d 1275 (2001); *In re Dependency of P.D.*, 58 Wn. App. 18, 792 P.2d 159 (1990); *In re Dependency of Ramquist*, 52 Wn. App. 854, 765 P.2d 30 (1988). We agree that, when the record establishes that the offer of services would be futile, the trial court can make a finding that the department has offered all reasonable services. *In re Parental Rights to B.P.*, 186 Wn.2d 292, 297, 376 P.3d 350 (2016); *In re Welfare of M.R.H.*, 145 Wn. App. 10 (2008).

We also remanded to the trial court to conduct a hearing on whether a parenting assessment would have assisted Lawrence Miller in correcting his parenting deficiencies. The trial court, based on strong evidence, determined that a parenting assessment would have been futile.

Incarceration as a Factor

Lawrence Miller forwards several arguments related to his incarceration. First, in continuation of his argument above, Miller argues that all necessary services were not offered because the department failed to investigate what services were available to Miller during incarceration. Second, Miller argues the trial court erred in failing to consider the incarceration factors mandated in RCW 13.34.180(1)(f). Third, Miller argues the trial court erred when it failed to consider his incarceration for purposes of

17

rebutting the statutory presumption of little likelihood conditions could be remedied so the children could return home in the near future. We address each argument in turn.

RCW 13.34.136 governs the permanency plan that DSHS must create during the dependency. The statute mandates that, when a parent is incarcerated, the plan "must address how the parent will participate in the case conference and permanency planning meetings and, where possible, must include treatment that reflects the resources available at the facility where the parent is confined." RCW 13.34.136(2)(b)(i)(A). Lawrence Miller couples the permanency planning statute with RCW 13.34.180(1)(d), which addresses services prerequisite of termination, to argue that a meaningful offer of services requires DSHS to acquire information about services reasonably available to the parent while he or she is incarcerated. Miller then argues the record does not show reasonable efforts were made during his incarceration.

An identical argument was made by a parent in *In re Dependency of D.L.B.*, 186 Wn.2d 103, 376 P.3d 1099 (2016). There, our Supreme Court did not disagree with the underlying legal argument, but instead, disagreed with the factual argument that the record did not support that reasonable efforts were made by the department to provide services while incarcerated. The court noted that the undisputed testimony in that case established that the social worker *did* contact the jail to inquire about available services for the parent. Thus, the court rejected the argument that the department violated any duty to provide services since "[t]he record show[ed] the Department made reasonable

18

efforts to refer [the parent] to the necessary services available in jail." *In re Dependency of D.L.B.*, 186 Wn.2d at 123.

Other state laws are instructive as well. In Oregon, a father appealed the trial court's decision to change the permanency plan from reunification to adoption. *Department of Human Services v. S.W.*, 267 Or. App. 277, 340 P.3d 675 (2014). Similar to providing necessary services before terminating rights, Oregon law dictates that a change in a permanency plan from reunification to adoption is only supported if the State provided the parent with a reasonable opportunity to demonstrate his or her ability to adjust his or her conduct and become minimally adequate parents. In *S.W.*, the father assigned error to the lower court's finding that the State met its burden and made reasonable efforts to reunite the father with the child. Specifically, the father objected to an intermittent 33-month period of incarceration when the State failed to contact prison counselors to discuss the availability of services to the father while incarcerated. The Oregon appellate court noted that cases involving incarcerated parents present unique challenges, but "the mere fact of a parent's incarceration does not excuse DHS from making the reasonable efforts required by statute." *Department of Human Services v. S.W.*, 267 Or. App. at 286.

Under Oregon law, for example, when the State only communicated with a father twice while the father was incarcerated and the communication consisted of the State instructing the father to contact it on his release, the court found the State's efforts were

not reasonable. *State ex rel. Juvenile Department v. Williams*, 204 Or. App. 496, 507, 130 P.3d 801 (2006). In that case, however, the father had participated in all programs offered at the jail. In contrast, the Oregon court found the State's efforts reasonable in a different case when the State made phone calls to the incarcerated parent, visited the parent and offered a substance abuse evaluation, communicated with the parent's prison counselor regarding services available to the parent in prison, and investigated whether it would be appropriate for the children to visit the parent in prison. *Department of Human Services v. D.L.H.*, 251 Or. App. 787, 801-02, 284 P.3d 1233 (2012).

In *S.W.*, the father had been incarcerated for four months when the department first opened the case in March 2010 regarding the father and his child. Despite being incarcerated, the State facilitated a treatment program for the father. In May 2010, the State picked up the father from jail and drove him to Portland for a residential substance abuse treatment program. During the father's stay there, the State arranged for three visits with his child and handed him a "letter of expectation" regarding what services the father needed to complete. *Department of Human Services v. S.W.*, 267 Or. App. at 280. Halfway through the program, the State learned the father was not actually participating and had not yet begun the "first step." *Department of Human Services v. S.W.*, 267 Or. App. at 280. When the father was released from the program in November 2010, he stopped communicating with the State. Then, roughly 40 days later, in January 2011, the father became re-incarcerated in Washington until March 2012. The father was

20

transferred from prison in Washington to a prison in Oregon while awaiting sentencing on probation violations from the father's original Oregon court case.

During the father's second stay in prison in Oregon, the State sent letters of expectation, had two telephone calls and one meeting with the father, encouraged him to write letters to his child and delivered those letters, and arranged for a psychological evaluation. The court characterized those efforts as something more than virtually nonexistent, but less than ideal. *Department of Human Services v. S.W.*, 267 Or. App. at 289. Yet, the court explained that the lower court was not concerned only with what the State did during the 33 months of incarceration, but was required to evaluate the State's efforts over the life of the case. The father's own conduct and responses to the State's efforts also factored into the analysis.

The *S.W.* court highlighted the fact that early, during the father's first incarceration, the State made significant attempts to engage the father in treatment and develop a relationship between the father and child. These attempts included the State's facilitating the treatment program in Portland and personally transporting the father as well as arranging for visitation with the child. The State encouraged the father to participate in Alcoholics Anonymous, but the father expressed a disinterest in the meetings. He then ended contact with the State once released from the treatment program and walked away from a visit with his child before committing new crimes and becoming re-incarcerated. Thus, although the court agreed that the State could have done

21

more during the 33-month period of incarceration, the court found that a totality of circumstances over the life of the case supported the lower court's decision finding that the State provided reasonable opportunity for the father to become an adequate parent.

Lawrence Miller was arrested at the start of the dependency. Once released, he appeared at court in March 2015 to sign the agreed dependency order, which included a list of services to complete. The social worker needed to schedule referrals and told Miller to call her in one week. Miller did not call the next week, and DSHS had no further contact with him until October 2015, one month before the permanency planning hearing, when DSHS learned Miller had been incarcerated. When the social worker spoke with Miller in jail about engaging in services, he responded "maybe."

Early in the dependency, DSHS arranged for visitation between Lawrence Miller and his children. Miller only attended twice. DSHS's social worker handed Miller a letter detailing services. Miller declined services, particularly chemical dependency treatment needed for him to benefit from other services. Once Miller left jail, DSHS urged him to continue visits with his children, to which Miller replied that he was too busy.

The record contains no evidence that DSHS contacted any of Lawrence Miller's correctional facilities to learn of services available. If Lawrence Miller engaged in services while outside jail, we might rule that DSHS failed to meet its burden when failing to inquire of jail services. Nevertheless, based on the totality of the

22

circumstances, we agree that the trial court, based on sufficient evidence, correctly found that the State reasonably offered services to Miller.

When a parent is incarcerated, before making a finding regarding the child's prospects for early integration into a stable home, the court must first consider whether the department has made "reasonable efforts." RCW 13.34.180(1)(f). This language became part of the statute after amendments in 2013. *In re Parental Rights to M.J.*, 187 Wn. App. 399, 407-08, 348 P.3d 1265 (2015). In part, the effect of the amendment was "to require [the department] to make reasonable efforts to help the incarcerated person remedy parental deficiencies." *In re Parental Rights to M.J.*, 187 Wn. App. at 408. While the trial court need not make explicit findings regarding the incarceration factors, some evidence in the record must show the court "considered" the factors. *In re Parental Rights to M.J.*, 187 Wn. App. at 409. This could be as simple as the court stating on the record that it considered the factors. *In re Parental Rights to M.J.*, 187 Wn. App. at 409. In *M.J.*, this court remanded for record consideration of the incarceration factors when we were unable to ascertain how the trial court considered the factors.

In regard to a child's integration into a stable and permanent home, if the parent is incarcerated, "the court shall consider whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b); whether the department made reasonable efforts as defined in this chapter; and whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, *delays*

23

*or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.*"  RCW 13.34.180(1)(f) (emphasis added).  The barriers from RCW 13.34.145(5)(b) referenced in the statute include "[*l*]*imitations in the parent's access to* family support programs, *therapeutic services, and visiting opportunities, restrictions to telephone and mail services*, inability to participate in foster care planning meetings, and difficulty accessing lawyers and participating meaningfully in court proceedings[.]"  RCW 13.34.145(5)(b)(v) (emphasis added).

The trial court expressly found that incarceration was not the primary barrier that precluded Lawrence Miller from services and maintaining a relationship with his children.  Although the record lacks full details as to the trial court's consideration of the incarceration factors, the record, particularly through this finding, demonstrates that the court contemplated the factors.

Lawrence Miller emphasizes the trial court's relying on the statutory presumption of little likelihood that the parental deficiencies could be remedied in the near future and such reliance demonstrates a failure to consider the incarceration factors.  In turn, Miller complains that the trial court did not consider his incarceration when finding that he would unlikely correct his parental deficiencies.

RCW 13.34.180(2) reads that, in rebuttal of the presumption of the unlikelihood of a return to the home, the court "may consider the particular constraints of a parent's

current or prior incarceration." Nevertheless, use of the word "may" in a statute is permissive and confers discretion upon the trial court. *State v. Gettman*, 56 Wn. App. 51, 782 P.2d 216 (1989). Thus, the statute allows, but does not require, the court to consider specific issues associated with a parent's incarceration for the prong unlike the incarceration factors discussed above that are mandatory for the trial court to consider.

Remedy of Deficiencies in Near Future

Lawrence Miller also challenges the finding of little likelihood his deficiencies could be remedied in the near future on nonincarceration related grounds. Miller asserts the trial court erred in applying the statutory presumption because he presented enough evidence of good progress to rebut the presumption.

One of the six statutory elements that must be proved before terminating parental rights is that there is little likelihood the parental deficiencies can be remedied in the near future. RCW 13.34.180(1)(e). A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood the deficiencies will be remedied. RCW 13.34.180(1)(e). When the presumption applies, however, it only shifts the burden of production, not the ultimate burden of persuasion, to the parent. *In re Welfare of C.B.*, 134 Wn. App. 942, 955, 143 P.3d 846 (2006). Even when the presumption applies, the State retains the burden of convincing the court that it is highly probable the parental deficiencies would not have improved in the near future. *In re*

*Welfare of C.B.*, 134 Wn. App. at 956. What constitutes the near future depends on the age of the child and the circumstances of the child's placement. *In re Welfare of C.B.*, 134 Wn. App. at 954.

For example, in *C.B.*, anger management and drug use were the main parental deficiencies at issue. *In re Welfare of C.B.*, 134 Wn. App. at 947-48. The parent completed a chemical dependency program and presented evidence from counselors and friends that her prognosis was good and that she was a different person. *In re Welfare of C.B.*, 134 Wn. App. at 956. The trial court reasoned it was likely the parent was capable of improving, but thought the timing was too late. *In re Welfare of C.B.*, 134 Wn. App. at 953. The appellate court noted the trial court's willingness to view the parent as capable of improving the deficiencies in mentioning the deference given to the lower court. In concluding that the parent had produced enough evidence to overcome the statutory presumption, the court held that where a parent produces evidence that he or she has been improving over a four-month period after the State files a termination petition, but before the termination hearing, the State may not rest solely on past performance to prove it is highly probable conditions will not be remedied in the near future.

Lawrence Miller compares his case to *C.B.* in order to argue that he produced enough evidence to overcome the rebuttable presumption that deficiencies will not improve in the near future. *C.B.*, however, is distinguishable. Lawrence Miller had one month of marginal progress, not four months of good progress, and he had not completed

26

treatment. Miller's trial court did not look favorably on his progress like the trial court in *C.B.* All four of Miller's children resided in foster homes, two in each home with the homes within the same neighborhood. Both foster homes registered a willingness to adopt. We find the trial court based its finding of fact on sufficient evidence.

## CONCLUSION

We affirm the trial court orders terminating Lawrence Miller's parental rights to his four children.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Fearing, J.

WE CONCUR:

Siddoway, J.

Pennell, A.C.J.